CASE 4.—PROCEEDING TO PROBATE THE WILL OF W. N.
    WATSON, DECEASED.—October 5, 1909.

## Watson's Exr v. Watson.

Appeal from Logan Circuit Court.

W. P. SANDIDGE, Circuit Judge.

From the judgment the executor appeals.—Re-
versed.

1.  Wills—Probate—Evidence—Admissibility.—In  a  proceeding
    to probate a will, contested on the ground of testamentary
    incapacity and undue influence, it is error to allow evidence
    of proceedings six months after the execution of a will,
    resulting in a judgment finding testator at that time mental-
    ly incompetent to manage his estate by reason of infirmity
    and age, since it takes less capacity to make a will than to
    transact business generally.
2.  Wills—Probate—Presumptions—Burden of Proof.—Where the
    propounder of a will proves the due execution thereof, and
    it is not irrational in its provisions or inconsistent in its
    structure with the sanity of testator, the presumption of law
    makes for him a prima facie case, and the burden of prov-
    ing testamentary incapacity is shifted to contestant.
3.  Wills—Probate—Evidence—Instructions.—Where, in a pro-
    ceeding to probate a will, the testimony of the subscribing
    witnesses, testifying unequivocally and consistently to the
    execution of the will, was not contradicted or impeached,
    and their evidence showed that testator acknowledged the
    signature as his and had the witnesses witness it, it was
    error to submit to the jury the question whether testator
    executed the will and the genuineness of the signature to
    the will.
4.  Wills—"Testamentary Capacity."—One having such mental
    capacity as enables him to know the natural objects of his
    bounty, his obligations to them, the character and value
    of his estate, and to dispose of it according to a fixed pur-
    pose of his own, has testamentary capacity.

5. Wills—"Undue Influence."—Undue influence defeating a will is any influence over the mind of testator to an extent that destroys his free agency and to constrain him to do against his will what he would otherwise refuse to do, whether exerted at one time or another, directly or indirectly, if it so operated on his mind at the time he executed the paper, but any reasonable influence obtained by acts of kindness or by appeals to the feelings or understanding, and not destroying free agency, is not undue influence.

6. Trial—Permitting Jury to Take Papers.—It is the better practice not to allow the jury to take papers to the jury room for examination after the case is submitted, unless by consent of counsel, and, where the jury wish to examine any paper given in evidence, they should ordinarily be brought back into the courtroom, and the examination had in presence of the court and counsel.

SIMS, DUBOSE & RHODES, S. Y. TRIMBLE and R. W. DAVIS for appellant.

BROWDER & BROWDER AND JOHN S. RHEA for Appellees.

OPINION OF THE COURT BY JUDGE HOBSON—Reversing.

W. N. Watson died in May, 1907, a resident of Logan county. After his death a paper purporting to be his will was offered for probate in the Logan county court. On a hearing of the matter the county court refused to probate the paper as his will. An appeal was taken to the Logan circuit court. The case was there heard before a jury, who found by their verdict that the paper was not his will. The court entered judgment on the verdict, and the propounder appeals.

For the purposes of the appeal, it will be necessary to state only the substance of the proof heard on the trial. W. N. Watson was 87 years old at the time of his death. He owned a farm worth about $7,-500, and some personal property on the farm. He was

married in the year 1853. His wife died not long after their marriage without children, and he did not marry a second time. His heirs at law were numerous nieces and nephews, and the descendants of nieces and nephews who had died. He had a great-niece, Onie Kockem, who was living with him at the time the will was made, and by the will in contest he left her his whole estate. The paper is in these words: ''February 12th, 1906. I, W. N. Watson, being of sound mind and disposing memory, and realizing the uncertainty of life, and wishing to direct the disposition of my property while living, do make and declare this writing to be my last will and testament, and I hereby revoke any will heretofore made by me. First, I direct that all of my just debts be paid, together with my funeral expenses, and that a neat and simple tombstone be erected at the head of my grave, and an iron railing be placed around my grave. Second, having known Roderick Perry during his life time, as a man of integrity and honesty, I hereby nominate and appoint his son, Wesley Perry, as my executor, but I direct that the court require him to execute bond for the faithful discharge of his duty. Third, I give and bequeath to my dearly beloved grand-niece, Onie H. Kockem, in consideration of her continual kindness and aid to me in my old age and lonliness, all the remainder of my property and effects of whatsoever nature, real, personal and mixed owned or possessed by me at the time of my death, the same to be held by my grand-niece, Onie H. Kockem aforesaid, absolutely for her own use and benefit, with power to dispose of as she may wish.''

He lived on his farm from the death of his wife alone with some negro servants, who lived in a cabin

not far from his house, until July, 1905, when Mrs.
Kockem became a member of the family, and lived
with him from that time until after the will was
made.    In March after the will was made he and
she went to New York, and returned after a month
or so, when a proceeding had been instituted to de-
clare him incompetent by reason of age and infirmity
to manage his estate.    After their return from New
York an inquest was found declaring him incompe-
tent, a committee was appointed for him who took
charge of him and his estate, and placed him at a
neighbor's house, where he remained until his death
the following May.    The subscribing witnesses to the
will were introduced by the propounders on the trial,
and testified to the due execution of the will, and
that the testator was at the time of sound mind.    The
contestants then introduced a large amount of evi-
dence showing that after he was moved from home
in August following the execution of the papers he
had little or no mind, and was suffering from senile
dementia, which is a disease of slow development,
and physicians who saw him testified that from his
condition then he was not in their judgment compe-
tent to make a will in the preceding February.
There was some proof to the effect that he then de-
clared he had made no will; also, that he said that
he had signed some paper which they had brought
to him but he did not know what it was; that he was
not attached to Mrs. Kockem, but spoke slightly of
her, and there was considerable evidence tending to
show that she exercised a dominating influence over
him while they lived together at his old home.    On
·the other hand, the testimony for the will was, in
effect, that he had been especially attached to Mrs.
Kockem's mother; that, when she was 15 years old,

she paid him a visit of some length, and he became very much attached to her, called her "his little girl;" that from that time on the most affectionate relation existed between them, she visiting him from time to time and sending him presents; that in December, 1903, he had a fall, breaking his hip. She at once came from New York, bringing a servant with her, and, finding him in a neglected condition, stayed with him, nursed him, and provided him with such things as he needed, and took care of him until he was discharged by the doctor the following spring. During the years 1904 and 1905 he ran his farm, attended to his business, drove about in his buggy, and lived pretty much as he had done before. Mrs. Kockem came back to see him in the fall of 1904, and, when she returned in the summer of 1905, she found that his servants were neglecting him, and at his request she then stayed with him. Several witnesses testify to his declarations that she had been very good to him, and that he intended to leave her what he had. Other witnesses testify to declarations made by him after he was taken from home to the effect that he had made a will and had left her everything he had because she was so good to him. He was a man of naturally good sense and strong character. He was from the infirmity of age in a very bad condition when Mrs. Kockem took charge of the household. He needed tender ministrations, constant care. She washed him, shaved him, attended to his personal wants, which were of a peculiar nature, owing to a bowel trouble from which he suffered. His other relations appear to have paid him little or no attention, and to have left him entirely to the mercies of the negroes on the place until it was conceived that a proceeding should be instituted to have him declared incompetent to manage his estate.

Mrs. Kockem evidently waited upon him very ten-
derly and at no little personal sacrifice. There was
a large amount of evidence for the propounders
tending to show that he was entirely competent to
make a will, and that the will was executed in pursu-
ance of a long cherished purpose on his part and in
view of the services and self-sacrifice of Mrs. Kock-
em on his behalf.

The court allowed the contestants to read to the
jury the verdict and judgment finding him mentally
incompetent to manage his estate by reason of in-
firmity and age in August, 1906. This was error. It
takes less capacity to make a will than to transact
business generally. A person may by reason of in-
firmity and age be mentally incompetent to look after
a farm and attend to business transactions of this
sort when he would be entirely competent to make a
will. At the time the inquest was held he was sick
in bed, and too sick to be moved from the house for
some weeks after the inquest. A man in this con-
dition might well be in the judgment of a jury incom-
petent from age and infirmity to take care of his es-
tate. This was not the issue to be tried here. The
question here is: Had he testamentary capacity in
February 1906? The verdict of the jury found six
months later upon a different issue would serve only
to confuse and mislead the jury, and should not have
been admitted. No evidence should be allowed as
to that proceeding on another trial, unless neces-
sary to explain some other material fact, and then
the jury should be charged not to consider it as evi-
dence here. Kinne v. Kinne, 9 Conn. 102, 21 Am.
Dec. 732; Terry v. Buffington, 11 Ga. 337, 56 Am.
Dec. 423; St. Leger's Appeal, 34 Conn. 434, 91 Am.
Dec. 735.

The court at the conclusion of the evidence gave the jury the following instruction: "The court instructs the jury that if they should believe from the evidence before them that the name of W. N. Watson was subscribed to the paper offered for probate and purporting to be the will of the deceased, W. N. Watson, by the said Watson or by some other person in his presence at his direction, and that the said paper was subscribed in the presence of T. D. Evans and R. W. Davis as witnesses, or that the same was acknowledged by the testator in the presence of T. D. Evans and R. W. Davis, and that said T. D. Evans and R. W. Davis subscribed their names to said paper as witnesses thereto in the presence of said W. N. Watson, and that the said Watson was then of sound mind, the jury should find the paper to be the will of said Watson." This instruction is erroneous in two particulars. In the first place, it places the burden upon the propounders to show that Watson was of sound mind at the time he executed the will. This was improper. The rule is that when the propounders of a will have proved the due execution of the paper, and it is not irrational in its provisions or inconsistent in its structure, language, or details with the sanity of the testator, the presumption of law makes out for them a prima facie case, and the burden of showing that testator was not in fact of testamentary capacity at the time of the execution of the will is shifted upon the contestants. Milton v. Hunter, 13 Bush, 170; Woodford v. Buckner, 111 Ky. 241, 63 S. W. 617, 23 Ky. Law Rep. 627; Henning v. Stevenson, 118 Ky. 318, 80 S. W. 1135, 26 Ky. Law Rep. 159, and cases cited.

The instruction is also erroneous in that it submits to the jury the question whether Watson executed

the paper. The subscribing witnesses testify unequivocally and consistently to his execution of the paper. They are in no wise contradicted or impeached. The contestants put in evidence before the jury some checks, and it is said that the signature to these checks is so unlike the signature to the will as to show that Watson did not write it. We have examined the checks, and we find as great difference between the signatures to some of them as between the signature to the will and any of them. More than this, though Watson did not write it himself, still, the proof being unimpeached or uncontradicted that he acknowledged the signature as his and had the witnesses to witness it, the question of the genuineness of the signature should not be submitted to the jury. The subscribing witnesses are men of high character, and to submit the question to the jury would be to imply that there was something in the case warranting the jury in disregarding their uncontradicted testimony. In lieu of instruction 1, the court under the evidence should tell the jury that they should find the paper offered for probate to be the will of W. N. Watson unless they believe from the evidence that said Watson was at the time of its execution not of sound mind, or that the execution of the paper was procured by undue influence. Instruction 3 is the converse of No. 1, and is for the same reasons erroneous. In lieu of it, the court should tell the jury that if they believe from the evidence that W. N. Watson was not of sound mind at the time of the execution of the paper, or that the execution of the paper was procured by undue influence, they should find it not to be his last will and testament. These two instructions, with one defining testamentary capacity and another defining un-

due influence as below indicted, are the whole law of the case. A person is of sound mind in making a will if at the time of its execution he has such mental capacity as to enable him to know the natural objects of his bounty, his obligations to them, the character and value of his estate, and to dispose of it according to a fixed purpose of his own. Woodford v. Buckner, 111 Ky. 246, 63 S. W. 617, 23 Ky. Law Rep. 627. Undue influence is any influence obtained over the mind of the testator to such an extent as to destroy his free agency and to constrain him to do against his will what he would otherwise refuse to do, whether exerted at one time or another, directly or indirectly, if it so operated upon his mind at the time he executed the paper. But any reasonable influence obtained by acts of kindness or by appeals to the feelings or understanding, and not destroying free agency, is not undue influence. Turley v. Johnson, 1 Bush, 117; Broaddus v. Broaddus, 10 Bush, 299; Bush v. Lisle, 89 Ky. 393, 12 S. W. 762, 11 Ky. Law Rep. 708. It is better practice not to allow the jury to take papers to the jury room for examination after the case is submitted unless by consent of counsel. If the jury wish to examine any paper given in evidence, they should ordinarily be brought back into the courtroom and the examination had in the presence of the court and counsel. It is not necessary for them to have any other paper than the court's instructions in the jury room. We do not mean to hold that it would be cause for reversal if other papers were taken to the jury room. The court has a discretion in such matters (L. & N. R. R. Co. v. Berry, 96 Ky. 609, 29 S. W. 449, 16 Ky. Law Rep.

722), and its discretion will not be reviewed unless abused.

The other matters complained of will not likely occur on another trial.

Judgment reversed and cause remanded for a new trial.