## Yahr, et al. v. Hynes, et al.

(Decided June 16, 1914.)

### Appeal from McCracken Circuit Court.

1. Wills—Undue Influence.—Undue influence that would defeat a will is any influence over the mind of the testatrix to an extent that destroys her free agency, and constrains her to do against her will what she otherwise would refuse to do, whether exerted at one time or another, directly or indirectly, if it so operated on her mind at the time she executed the paper; but any reasonable influence obtained by acts of kindness or by appeals to the feelings or understanding, and not destroying free agency, is not undue influence.

2. Wills—Testamentary Capacity—Undue Influence—Question for Jury—Evidence.—In a will contest, held that under the evidence both the questions of testamentary incapacity and undue influence were for the jury.

3. Wills—Undue Influence—Evidence—Instruction.—Where, in a will contest, the evidence showed that the devisee was neither the draftsman of the will nor the confidential adviser of the testatrix, it was not error to refuse to give an instruction imposing on the contestees the burden of showing that the will was not obtained by undue influence.

HESTER & HESTER for appellants.

BERRY & GRASSHAM for appellees.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

By her last will and testament, dated February 28, 1913, Josephine Smith, who died a resident of McCracken County, Kentucky, devised all of her property to her adopted sister, Lucy Hynes. Two aunts and certain cousins of the testatrix attacked the will on the ground of testamentary incapacity and undue influence. A trial in the McCracken Circuit Court resulted in a verdict sustaining the will. Judgment was entered accordingly and contestants appeal.

Two grounds are urged for reversal: (1) The verdict is flagrantly against the evidence; (2) the circumstances surrounding the execution of the will were such as to require an instruction imposing on the devisee the burden of showing that the will was not obtained by undue influence.

The evidence discloses the following facts: For several years, there lived in the city of Paducah an aged German woman by the name of Johanna Stucks. She was a widow, and owned some little property. She had only one child, Josephine Smith. Several years before Mrs. Stucks' death she adopted the contestee, Lucy Hynes. For a number of years prior to Mrs. Stucks' death, Lucy Hynes and Josephine Smith lived with her in the same home. A short time before Mrs. Stucks' death Lucy Hynes married and moved away. When Mrs. Stucks died she left a will by which she devised part of her property to Josephine Smith and the balance to Lucy Hynes. In June, 1912, Josephine Smith conveyed certain real estate to her adopted sister in consideration of love and affection. At that time Josephine Smith lived in Paducah and Lucy Hynes in St. Louis, Missouri. After that time Josephine Smith became ill with cirrhosis of the liver. Lucy Hynes came from St. Louis and spent a large period of the time looking after the wants of her adopted sister. The will was executed on Friday afternoon, February 28th. Mrs. Smith died the next day.

For the contestees, Arthur Martin, an attorney of Paducah, says that he saw the testatrix about a week before she died, and she talked in a rational way. She then told him that she supposed everything was fixed all right; that her mother's will had provided for Lucy. Four or five weeks before that time he had a conversation with

testatrix about the distribution of the property. At that time she said she wanted Lucy to have her property, and it was her intention to have her will fixed up. Fred Hummell, who drew the will, had a conversation with the testatrix about a year before she died. She then said she wanted Lucy to have everything she had. Mr. Hynes telephoned for him to write the will. He did not have any conversation with Mr. Hynes about the terms of the will. He wrote the will on the porch. He prepared it in accordance with the testatrix's wish, declared to him about a year before, that she wanted Lucy to have the property. After writing the will he took it into testatrix's room. Dr. Reddick was there. The will was read over to the testatrix, and she was asked the question if that was what she wanted. She replied in the affirmative, and executed the will by making her mark. At that time testatrix was all right, and capable of making a will. Dr. Reddick, the attending physician, was present when the will was executed. He testified to the same facts in connection with its execution. In his opinion, testatrix had sufficient mental capacity to execute the will. The first person who spoke to him about the will was Mr. Schroeder. About ten days before testatrix died he spoke to her about making a will. Testatrix then said something about wanting to make a will, and wanting Mr. Hummell to come down. While testatrix was in a weakened condition, in his opinion, her mind was all right when the will was made. William Schroeder testified that he suggested to Dr. Reddick that testatrix ought to make a will. He had been attending to her business as her agent. When he conferred with testatrix about her will, she said: "I will have plenty of time to do that." Testatrix also said: "Mother's will leaves things to Lucy." Mr. Grother, a minister of the German Lutheran Church, saw testatrix frequently before her death. He was there on Friday. In his opinion she had sufficient mental capacity to know her property and relatives, and what she wanted to do with her property. Mrs. Hynes also testified that the testatrix knew her, and that her mind was all right when the will was made. She was in the room when the will was executed. Certain letters were introduced showing that the relations between testatrix and Mrs. Hynes were friendly and cordial. Furthermore, it was made to appear that the relatives contesting the will had never been on friendly or intimate terms with the textatrix. As a matter of fact, they had had nothing to do with her.

For the contestants, two women, Mrs. King and Mrs. Randolph, who had nursed Mrs. Smith for several months before her death, testified that her mind was so bad for three or four days before she died that she scarcely knew anything. On the evening before she died they heard discussions going on in the room where Mrs. Smith lay. From these discussions she was being urged to make her will. Mrs. King says that she was doing some household work in the kitchen, adjoining the room in which testatrix lay, and heard those present asking Mrs. Smith to make a will. When she returned from her milking she met Mrs. Hynes coming out of the room crying. Mr. Hynes said that "Josephine had been worried, so she shoved her back and hurt her feelings." Mrs. Rhodes testified that she was at testatrix's residence between one and two o'clock on the day before she died, and remained an hour and a half. In her opinion, the condition of her mind was not then such that testatrix knew anything about her property or what disposition to make of it. Mrs. Dowd, who was also present for two or three hours on Friday afternoon, stated that testatrix's mind was not in a condition to do anything.

Contestants insist that though the evidence on the testatrix's mental capacity is conflicting, yet there is practically no evidence rebutting the evidence of undue influence. In this connection it is argued that Mr. Hynes telephoned to the lawyer. The lawyer prepared the will making Mrs. Hynes the sole devisee because he had been told several months before by testatrix that she intended Mrs. Hynes to have everything. In addition to this fact it is shown that those present were insisting on Mrs. Smith making a will, although it is admitted that even if her mental capacity was all right she was then in a very feeble condition. This argument assumes that because the will was prepared by the attorney beforehand, and that there was evidence tending to show that the testatrix was urged to make the will, these facts are conclusive of undue influence. Such, however, is not the rule. Undue influence that would defeat a will is any influence over the mind of the testatrix to an extent that destroys her free agency, and constrains her to do against her will what she otherwise would refuse to do, whether exerted at one time or another, directly or indirectly, if it so operated on her mind at the time she executed the paper, but it is also well settled that any reasonable influence obtained by acts of kindness or by appeals to the feelings

or understanding, and not destroying free agency, is not undue influence. Watson's Exor. v. Watson, 137 Ky., 25. There being evidence that the testatrix's mind was all right, and that she had previously declared her intention to provide for her adopted sister, the mere fact that she was urged to make her will in her sister's favor is not conclusive on the question of undue influence. Indeed, when we consider the relations existing between the testatrix and Mrs. Hynes, and the further fact that the contestants are not shown to have had anything to do with the testatrix, or to have sustained any relations of cordiality or intimacy, coupled with the evidence of responsible parties that her mind was clear and all right when her will was executed, we conclude that notwithstanding the fact that there was substantial evidence to the effect that she did not have testamentary capacity, and that she was urged by those present to make a will in favor of her adopted sister, both the questions of testamentary incapacity and undue influence were for the jury, and on neither of these questions can it be said that its finding is flagrantly against the evidence.

Nor do we find any merit in the contention that the circumstances surrounding the execution of the will were such as to justify an instruction imposing on the contestees the burden of showing that the will was not obtained by undue influence. That rule was applied in Woods, Exor. v. Devers, &c., 14 Ky. L. R., 84, where the devisee was the draftsman of the will and the confidential adviser of the testatrix. In this case the devisee did not occupy either of these relations. True, the devisee's husband telephoned for the attorney, but it is not shown that he dictated or even suggested how it should be drawn. Nor is it shown that the devisee suggested the terms of the will, or in any way superintended its preparation. Under these circumstances, the ordinary instructions on testamentary capacity and undue influence apply, and such instructions were given by the court. The court, therefore, did not err in failing to give an instruction embodying the rule contended for by contestants.

Finding no error in the record prejudicial to the substantial rights of appellants, it follows that the judgment sustaining the will should be affirmed, and it is so ordered.