## Langford's Executor, et al. v. Miles, et al.

(Decided November 12, 1920.)

### Appeal from Anderson Circuit Court.

1. Wills—Mental Capacity.—If a testator has mental capacity sufficient to take a survey of his property, to know its value, to know the objects of his bounty and his duty to them, and to dispose of his property according to a fixed purpose of his own, he is competent to make his will.

2. Wills—Undue Influence.—Undue influence exercised on the testator so as to invalidate his will must have been obtained over his mind to such an extent as to destroy his free agency and to constrain him to do against his will what he would otherwise refuse to do, whether exerted at one time or another or directly or indirectly, if it operated on his mind at the time of the execution of his will; but any reasonable influence obtained by acts of kindness, affection or appeals to the feeling or understanding, which do not destroy free agency, is not undue influence.

3. Wills—Undue Influence—Evidence.—Testimony introduced to establish mental incapacity or undue influence must be something of substance and relevant consequence and not consist in vague, uncertain, remote or irrelevant matter not carrying the quality of proof or having the quality and fitness to induce conviction.

4. Wills—Mental Capacity.—Opinions of witnesses as to the mental capacity of a testator unsupported by any fact or circumstance to justify them are not entitled to weight in a proceeding contesting the validity of the will.

5. Wills—Mental Capacity.—The privilege to dispose of one's property after death by will, conferred upon the citizen by the statute, is a valuable one of which he should not be deprived upon slight, remote and wholly unsubstantial and non-probative testimony.

6. Wills—Requisites.—It is a relevant circumstance in a will contest proceeding that its provisions are rational, just, fair and equitable.

7. Wills—Mental Capacity.—The burden of showing mental incapacity or undue influence is upon the contestant, which must be

done by at least testimony of sufficient substance to have probative effect upon the issues involved. Where the testimony clearly shows that testator at the time he executed his will possessed the proper measure of mental capacity for the purpose and that he was not unlawfully influenced to do so, and from the whole record it is apparent that another trial would be both useless and expensive and result in unnecessary delay, this court will direct the judgment to be entered upon a return of the case.

W. H. MORGAN and CHARLES CARROLL for appellants.

LILLARD CARTER and EDWARDS, OGDEN & PEAK for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

W. H. Langford died a citizen and resident of Anderson county on the 25th day of July, 1918. His will, which was executed on March 11th prior to his death, was duly probated by a judgment of the Anderson county court, and appellees, who are the collateral kinsmen of the testator, prosecuted an appeal to the circuit court upon the two grounds, that the testator was not mentally capable of making the will and that he was unduly influenced to do so. Upon a trial in that court the jury empaneled to try the issues returned a verdict finding the paper in contest not to be the will of the testator. Upon that verdict judgment was pronounced and complaining of it appellants, who were the contestees below, prosecute this appeal. The sole ground urged for a reversal of the judgment is that the verdict upon which it is based is not supported by the evidence, and it is therefore insisted (a) that the court should have directed a verdict sustaining the will, but if not so (b) the verdict is flagrantly against the evidence. Our reading of the record, briefs of counsel and the many cases from this court dealing with the law applicable to the issues involved has thoroughly convinced us that there was a total failure on the part of contestants to show by any testimony of consequence or probative effect that the testator was either mentally incapable of making his will or that he was in the slightest degree unduly influenced to do so, and that counsel are correct in their contention (a) above.

Testator at the time of executing the paper in contest and at the time of his death was about 77 years of age, while his widow, the appellee Ella Langford, was some few years younger. They had been married over forty

years and had never been blessed with children though they had reared as a part of their family several persons from childhood to maturity, the last of whom was contestee John Cotton, who at the time of the trial below was twenty-seven years of age and who was taken in the household of the testator, as a member of the family, when he was only five years of age. Some fifteen or sixteen years before he died Mr. Langford became afflicted with what is commonly known as "chronic diarrhea" and continued to be troubled with that disease until his death. Just before or about the time of the contracting of that disease he executed his will, in which he gave to his wife all of his property for and during her natural life and at her death to his collateral kindred. Afterwards Cotton grew to manhood, he being according to the proof both a source of help and comfort to his god-parents. At times during testator's affliction he was greatly troubled with his bowels, especially at night, and his faithful wife was ever ready to and did render him all needed assistance. She not only nursed him when necessary both day and night during that long period, but she also looked after her household duties, mostly alone, and otherwise fully performed her duties as a true and loyal wife. She submitted to her confinement at home and exercised a punctilious watchfulness over her husband's physical condition and over his business affairs. Just before and at the time of the execution of the will the conditions surrounding the testator, as well as those surrounding his wife, had become materially changed from the date of the execution of the first will. She had grown considerably older and the burdens which she had borne for a number of years had made inroads on her physical condition, and since the testator's farm, consisting of 231 acres and valued at slightly more than $12,000.00, constituted about 90% of his property, it became evident that the condition of the wife would be much more enjoyable after her husband's death if the portion which she might receive from his estate was given to her absolutely, thus relieving her from occupying the farm alone and of the burden and trouble of managing it at her advanced age. Moreover, testator, as well as his wife, recognized at least the moral obligation to do something for John Cotton, the boy whom they had reared. So, under these circumstances the two old people talked among themselves about changing the first will or executing a new one in lieu thereof, the outcome of which was

that the will in contest was executed so as to give to the widow the personal property of the testator after payment of debts and amounting to perhaps less than one thousand dollars, and one-half of the proceeds of the farm, which was directed to be sold. Out of the other half of the proceeds of the farm John Cotton was devised one thousand dollars and the balance of that half was divided between contestants, who are the children and grandchildren of deceased brothers and sisters of the testator. It will thus be seen that the terms of the will are more than equitable and just so far as contestants are concerned. It could not have been criticized in these respects had it given the entire property of the testator to, the widow.

The only witnesses introduced by contestants in support of their grounds of contest are appellee, Myrtie Wilham, Dr. E. L. Milton, J. W. McAllister, Marion Armstrong, Jerry Sullivan and Mr. McGaughey. Mrs. Wilham is a niece of the testator and lived about ten miles from him, but according to her testimony she was at his house frequently, especially in the latter part of his life. She testified that the testator was feeble in health; that "he had been sick quite a while, but he would have spells worse than others," and that "when he had those spells so bad he seemed to be flighty when he was asleep." She testified to nothing even remotely bearing upon the issue of undue influence.

Dr. Milton was a local physician in the neighborhood, having practiced his profession since 1893, during which time he had managed to extend his practice, as he testified, "from Maine to California, I have patients in California, Maine, and Virginia." He attended upon and treated the testator up to his death. He testified that his patient would have spells or spasms of his physical affliction, during which time he would suffer considerable pain and that they would occur at irregular intervals, making the visits of the witness at times much more frequent than at others. He testified that according to his opinion the disease of the testator had a weakening effect upon his mind, but that he did not see him but few times if any during the month of March, 1918, in which month the will was executed and he could not state anything of testator's mental condition at that time; that on some occasions when the testator was in the midst of one of his spells or spasms witness thought he might not be mentally competent to transact business or execute a deed conveying his land, but that these occasions occurred mostly in

the night time. He testified that the spells to which he referred "would be at any time when he would be aggravated with his bowels, some time they would go for a month or two and not give him any trouble, then for a month or two it would be continuous," but he declined to say that such continuity existed during the month of March during which the will was executed. On the contrary he says that "his condition was better through March or April." On being asked the hypothetical question embracing the legal mental qualifications to execute a will the witness answered: "That would be a very hard question to answer. I remember talking the matter over with some of his neighbors, you see there has been an advance in the price of land," and the question being again propounded to him he said: "Well, as I say I don't know just how to answer the question, because there was such a variation, we talked over the price of the farm with his neighbors, he stated the price as to what he thought the property would bring, they talked of selling the property for a good long while and just living on the money, the interest on the money. He and his wife did talk over that plan with me." In another part of his testimony, being asked if he based his opinion as to the condition of testator's mind on his physical condition, he answered: "Yes, sir; also in proportion he would have these flighty spells." This is the substance of Dr. Milton's testimony upon the issue of mental incapacity. On the one of undue influence he testified that Mrs. Langford talked to him a number of times about her husband executing a new will or changing his first one and that he did not encourage it because he doubted testator's capacity. At one time testator asked the witness as to his competency to make a new will or change his first one and witness suggested that the matter be deferred until testator's then physical condition improved. There is no fact or circumstance testified to by this witness indicating any mental derangement of Mr. Langford. No conversation, word, act or deed, as testified to by him, indicated any weakness of mind. The substance of his testimony is that he was doubtful of testator's mental soundness, which doubt was based entirely upon his physical condition *at times* and which seems to have arisen in the mind of the witness only during the spasms or spells which the testator would suffer.

The witness McAllister is the father of three of the contestees. He lived about three miles from the home of the testator and saw him occasionally when he was pass-

ing through his worst spells. He says that at times he did not think the testator's mind was good, and on being asked the usual question he answered: "Well, I don't know; he was talking one day, him and Aunt Ella, about wanting to sell the farm, and he wanted to know what I thought about it. I told him he had better keep it." When asked (without objection) whether testator had mental capacity enough to trade or sell his farm he answered: "Well, I don't know about that." On the question of undue influence this witness stated that Mrs. Langford some time before the will in contest was executed stated to witness that her husband had executed a will before that time which was not suitable to her and that she was going to see if he would not change it so as to give her more property and to give her absolute control over her portion.

The witness McGaughey for two years prior to the testator's death lived at the latter's home but did various kinds of work in the neighborhood. He testified that at times he did not think the mind of the testator very good, but upon being asked why he thought so, witness answered: "Well, he would get up out of bed and he would get lost and couldn't get back." These occurrences, according to witness, would happen mostly in the night time. Being asked the condition of testator's mind on the day the will was executed, he answered: "Well, I don't know, he was sick or couldn't sit up at all, he was laying down in bed." Witness testified that on some occasions he heard Mrs. Langford talking to her husband about changing his will and, being asked what she said on this subject, answered: "I don't remember just exactly what she said, I think she said he ought to attend to it." Other conversations with the wife as testified to by this witness were in substance the same as the one referred to.

Marion Armstrong was a tenant upon testator's farm and he testified that at times the mind of the testator "seemed to be something similar to a child, he was very childish." Yet he testified that in conversations with the testator he seemed to understand and know what he was talking about. This witness further testified that after testator's death Mrs. Langford told him that on the day the will was written her husband called her and told her that he wanted her satisfied, when she told him, according to her testimony, that she would be satisfied with one-half of his property.

The witness Jerry Sullivan testified that according to his opinion the physical affliction of the testator affected to some extent his mental powers; that testator in conversations with the witness would talk about general topics, such as crops, the weather and the progress of the Great War. Being asked as to what Mrs. Langford said to him concerning the will he answered: "Well, she told me that she thought the old man ought to make a will and let her do as she pleased with the stuff that was there, that she had worked there forty odd years." This witness is an uncle of two of the contestants.

It will be observed that none of the contestants, other than Mrs. Wilham, testified in the case and we are convinced that the testimony of the witnesses for the contestants, the substance of which we have recited, does not rise to the dignity of a scintilla of proof upon either of the issues involved.

Statutes conferring the right upon one to make a will disposing of his property after his death extends to the citizen a most valuable privilege and his right to exercise it has been most vigilantly guarded by the courts. Juries should not be permitted, upon mere remote and speculative evidence having but little if any probative force, to take away that privilege because, forsooth, the terms of the will might not be in accord with their notions of justice or propriety. The law accords to every person the right to dispose of his property by will, if at the time he executed it he has sufficient mind to know his property, the objects of his bounty and his duties to them, and to dispose of his property according to a fixed purpose. This is the universal rule for the measurement of testamentary capacity and it is everywhere held that it requires less strength of mind to make a will than is required to execute a contract *inter partes* where each party to it has to combat the sagacity and cunning which may be exercised by the other contractor. In such cases one of the parties might be enabled, through a selfish desire to obtain an advantage, to get the better end of the bargain because of his superior mind over that possessed by the one with whom he is contracting. Not so in the executing of wills, which are more often than otherwise executed during one's last sickness and while he is, so to speak, on his deathbed. It is furthermore the law that the burden is on the contestant to establish by testimony of substance and relevant consequence the mental incapacity of the testator to execute the particular will involved, since it

will be presumed that he possessed sufficient capacity to do so. Some of the cases from this court supporting the principles above stated are: McDaniel's will, 2 J. J. M. 334; Elliott's will, idem. 340; Higdon's will, 6 J. J. M. 444; Howard v. Coke, 7 B. M. 655; Threllkeld v. Bond, 29 Ky. L. R. 178; Bramel v. Bramel, 101 Ky. 75; Clark v. Young, 146 Ky. 377; Sanders v. Blakely, 21 Ky. L. R. 1321; Bush v. Lisle, 89 Ky. 393; Hildreth v. Hildreth, 153 Ky. 597; Purdy v. Evans, 156 Ky. 342; Cecil v. Anhier, 176 Ky. 198; Robinson v. Davenport, 179 Ky. 598; Bailey v. Bailey, 184 Ky. 455, and Stutiville v. Wheeler, 187 Ky. 361. In decidedly most if not all of the above cases, the testimony for the contestants on the issue of mental capacity of the testator was much stronger in their favor than is the testimony upon that issue in the instant case. None of the witnesses in this case who testified against the will even pretended to say what was the mental condition of the testator on the day the will was executed except the witness McGaughey, whose testimony on that point is of no weight whatever. Their opinions concerning the testator's mind, based on no facts or circumstances indicating mental weakness, are regarded in law as of no probative value. Thus in the case of Clark v. Young, *supra,* in which the testimony had a greater tendency to support the grounds of contest than it has in this case, this court said: "As neither the inequality of the will nor the circumstances referred are sufficient to show undue influence or mental incapacity, it follows that opinions based thereon are likewise insufficient for that purpose. (Smith v. Commonwealth, 129 Ky. 433; Sanders v. Blakely, 21 Ky. Law Rep. 1321; Bush v. Lisle, 89 Ky. 393.) Nor does this conclusion conflict with the scintilla rule, for that rule requires some evidence, even though it be slight; and by evidence is meant something of substance and relevant consqeuence, and not vague, uncertain or irrelevant matter not carrying the quality of proof, or having fitness to induce conviction (Minnehan v. Grand Trunk, 138 Fed. 37)," and in the McDaniel will case, Judge Robertson writing the opinion says: "The opinions of witnesses are not entitled to much influence in such a case as this. The facts from which the opinions are deduced are more decisive." In that case the testator had been a paralytic for four years before executing his will. The paralysis was general and confined him to his bed. He had great difficulty in talking or making himself understood and there were many facts and circumstances proven cal-

culated to inspire the belief that his mind was to some extend at least impaired. The will, however, was rational, equitable and just upon its face, as is true in the instant case, and this court reversed the judgment refusing to probate the will and directed that it be admitted to probate. In the case of Bush v. Lisle, *supra,* the testator had many years before contracted a loathsome disease, which made severe inroads on his physical health and produced frequent paroxysms of pain. His eyesight was greatly impaired and his lower limbs were so affected as to require the constant use of crutches. He had likewise contracted the habit of using morphine to an excess, but none of the witnesses who testified against his will gave any concrete conversation, circumstances or facts upon which they based their opinion that he was mentally incompetent to execute it. This court in denying the sufficiency of the evidence to establish the grounds of contest said: "But neither one of those three witnesses (two of whom were physicians), nor any one else, throughout the entire trial, testifies to a single irrational act or speech by the decedent," and further along the court said: "Expert testimony is worse than useless, it is misleading, when given on a subject about which there is proof so convicing as to leave no reasonable ground for dispute, or when variant from the actual state or condition shown by positive evidence to exist; and no conclusion reached by a mere theorist, however learned, can be reasonably accepted and applied in any case without being founded on and consistent with the facts as they are found to be." In the Sanders case, *supra,* a number of witnesses testified that according to their opinion the testatrix did not have mental capacity sufficient to make a will, but they did not support their opinion with sufficient facts or circumstances to justify it, and this court, in reversing the judgment setting aside the will and directing its probate, said: "While some of the witnesses express the opinion that she did not have capacity to make a will, or said they doubted her capacity to make it, they all give their reason as a basis of that opinion, which shows that their opinions were without value." Many of the other cases cited state the principle in language equally as strong as that contained in the above excerpts, but it would unduly lengthen this opinion to insert them herein. It is sufficient to say that looking to the proof of contestants alone its utmost effect is to show that the deceased, Langford, would sometimes when aroused from a stupor appear not to realize

where he was, and according to Dr. Milton that his mind during an attack of a paroxysm was not as strong as that of a healthy man. We search the testimony of the witnesses for contestants in vain to find any fact or circumstance indicating that the testator was incapacitated according to the legal standard to make his will on the day it was executed.

Thus far we have considered only the testimony introduced for appellants. The contestees introduced themselves, W. H. Morgan, the attorney who wrote the will and who would be benefited by its rejection since he is the nephew of the testator, James E. Blackburn and J. B. Sweasy who witnessed the will, the executor of it and four other witnesses, all of whom not only give it as their opinion that the testator was competent to make his will but they testify to facts and circumstances which leave no doubt in the mind as to the truth of the matter. The attorney who drafted the will stated that it was done exactly according to the dictations of the testator and that after it was drafted and read to him he had it redrawn so as to include this clause: "If any of the persons named in my will should object to it or contest it in any court or courts, then I desire that the person or persons so doing shall have no part in my estate." He had stated, in substance, as most commendable reasons for changing his will or executing a new one that his wife was getting old and had largely worn herself out nursing him; that she could not live alone upon the farm, and that she would have better opportunities for enjoyment and comfort if she was given the absolute ownership in the portion of the estate devised to her; and further that he felt under obligation to do something for the orphan boy, John Cotton, whom he had reared. In substantiation of what we have heretofore intimated and as illustrating our view of the verdict in this case, we take from the opinion in the Purdy case, *supra,* this extract: "The very purpose of the statute of wills was to recognize and create a right in the owner, having testamentary capacity, to make disposition of his property according to his own choice and pleasure, and in variance, if need be, to the usual rules of inheritance as fixed by the statute of descent and distribution. And, if by reason of such conduct as has been shown in this case, on the part of Thomas C. Purdy, his will shall be made the subject of attack and its determination, dependent upon the whims and caprices of a jury, then it may as well be said by one who wishes to devise

his property, 'I desire that my property be distributed in the following manner; and I hope that a jury will think upon this subject as I do, and confirm my act.' "

The evidence in support of the contest, on the ground of undue influence exercised on the testator to make the will, is if possible weaker than that introduced in support of the other ground. It is not every influence exercised over a testator inducing him to execute his will that amounts to legal undue influence. In order for such influence to vitiate the will it must be "obtained by flattery, importunity, threats, superiority of will, mind, or character, or by what art soever that human thought, ingenuity, or cunning may employ, which would give dominion over the will of the testator to such an extent as to destroy *free* agency, or constrain him to do against his will what he is unable to refuse, is such an influence as the law condemns as undue when exercised by any one immediately over the testamentary act, whether by direction or indirection, or obtained at one time or another." Wise, etc. v. Foote, etc., 81 Ky. 10. Other cases from this court supporting this rule are Sechrest v. Edwards, 4 Met. 163; Sherley v. Sherley, 81 Ky. 240; Childers v. Cartwright, 136 Ky. 498; Watson v. Watson, 137 Ky. 25; Hildreth v. Hildreth, *supra;* Crump v. Chenault, 154 Ky. 187; Yahr v. Haynes, 159 Ky. 519; Bush v. Lisle, *supra;* Broaddus v. Broaddus, 10 Bush 299; Cecil v. Anhier, *supra;* Talbott v. Giltner, 179 Ky. 571, and many other cases, including some of those first above cited. The same authorities say that influence obtained by modest persuasion and arguments addressed to the understanding or appeals to the affections is not undue influence. In this case Mrs. Langford may have talked about having the will changed, but it is abundantly established that what she stated to the witnesses for contestants was the result of a deliberate and well matured conclusion which she and her husband had arrived at after thoroughly considering the changed conditions over those existing at the time of the execution of the first will. The widow testified that she stated to her husband that she was unwilling for him to give her all of his property, since she thought it right and just that he should give a portion of it to his collateral relatives. If it had been her intention to dominate over him and cause him to execute a will contrary to his desires and to influence him beyond his power to resist and to thereby destroy his free agency, or constrain him to do against his will what he was unable

to refuse, she would no doubt have procured him to give her his entire property. She did not do this, but on the contrary manifested a magnanimity for which she could not be criticized for declining to do but which was worthy of a life practically spent in the performance of duty, burdensome as it was. Neither her words nor her conduct paint a portrait of one actuated by sordid self aggrandizement.

While ordinarily it is the rule to direct a new trial in will contest cases, in reversing a judgment sustaining the contest, yet this court in the Broaddus, Sanders, Bush and Hildreth cases, supra, each of which contains stronger facts supporting the grounds of contest than are found in this record, directed the lower court the judgment which should be entered upon a return of the case. We feel constrained to follow those cases upon this point of practice since we are convinced that a new trial would be a useless expense and fruitless of results.

Wherefore the judgment is reversed with directions to dismiss the appeal from the county court.