## Purdy's Administrator, et al. v. Evans.

(Decided December 9, 1913).

### Appeal from Marion Circuit Court.

Wills—Delusions in Respect to Members of Testator's Family.—A delusion exhibited by a testator's aversion toward a daughter is not sufficient to invalidate his will, where it was not a spontaneous production of his mind, but had some basis in fact, how-

ever slight, the basis, or however imperfect the process of his reasoning or however illogical or unjust his conclusion that she was so greatly at fault as his conduct toward her would indicate his belief to have been.

S. A. RUSSELL and BEN SPALDING for appellant.

W. H. SPRAGENS and WILLIAM W. SPALDING for appellee.

OPINION OF THE COURT BY JUDGE HANNAH—Reversing.

Thomas C. Purdy, on September 11, 1855, married Miranda Shreve. This wife bore him one child, Miranda; and died in July, 1858. This daughter was born September 29, 1856; and Married Joseph Evans in October, 1872. She is the contestant herein.

In January, 1860, Thomas C. Purdy married Mary Dean, the only offspring of this second marriage being A. D. Purdy, the contestee herein, who was born in October, 1860. This last wife died June 23, 1907.

On April 14, 1873, said Thomas C. Purdy made and published his last will and testament. He procured Ex-governor Proctor Knott to prepare same. It was signed by him, and witnessed by his brother-in-law, W. F. Dean, and by Gov. Knott. This will devised all his property to his then wife, Mary, for life, with remainder to his son, A. D. Purdy (who was then in his thirteenth year); with the further provision that should there be other children thereafter born to said testator and his wife, they should share equally with said A. D. Purdy.

Appellee, Mrs. Evans, at the time of her mother's death was about 21 months old. She passed into the custody of her maternal grandmother, and remained with her until she married. She went to the home of her father on one occasion when she was about nine years of age, remaining some two or three months, attending school; and returned to her grandmother's when the school term was completed. Later, when she was about 14 years of age, her father asked her to come and live with him, but she declined, saying she preferred to remain with her grandmother. She went to her father's home once after that; and she testifies that because she refused to go and live with them, her step-mother told her not to return, and her father joined in this request; and that thereafter, her father would not speak to her in passing. This was a short time before her marriage. She married at the age of sixteen and her father vio-

lently objected to her marriage; and after said marriage would not speak to her, to her husband, or to any of her children. In answer to the question: "Did you ever seek a reconciliation with your father, of any type, kind or character, Mrs. Evans?"; she answered, "No, sir."

The will of Thomas C. Purdy was probated in the Marion County Court on April 10, 1911, and because of the fact that she took nothing thereby, and conceiving that the conduct of her father toward her was such as to constitute grounds for invalidating his will, she appealed from the order of the Marion County Court probating same, to the Marion Circuit Court seeking to have same set aside, upon the ground of insanity of the testator, and undue influence exercised by his last wife and son, A. D. Purdy, in obtaining the execution thereof. Upon the trial in the circuit court, a jury found the instrument probated not to be the last will of said Thomas C. Purdy; and from the judgment thereupon entered, setting it aside, this appeal is prosecuted. At the close of contestant's evidence, appellant asked a peremptory instruction, which was refused. He now contends that it should have been given. The court gave the usual instructions on undue influence and mental capacity.

It will be seen that at the date of the execution of the will in question, the contestee was but little past 12 years of age; and, therefore, was not chargeable with the exercise of undue influence over his father. There was no evidence whatever of a direct nature, connecting the wife with the making of the will, or suggesting that it should be so made, nor made at all. As to the undue influence attributable to the wife, appellee relies on the simple fact that she being the wife of the testator, was in position to influence him; and that she on one occasion said that she did not care for the daughter having her mother's things, but that "the remainder of the stuff we mean for Alfred to have."

Both the claim of insanity of the testator, as well as the charge of undue influence exercised by the second wife, inducing the execution of the will in contest, really rests upon the conduct of the testator toward his daughter; and the asserted inference therefrom of an insane delusion with respect to her. There is no claim of mental incapacity in any other regard; in fact all of the proof goes to establish that the testator, while of a

reticent temperament, was a man of more than ordinary business ability and mental capacity.

Upon the claim of insanity of the testator, the only direct proof was that of Dr. Milton Board. He was asked this hypothetical question "Assuming that a testator was born about the year 1830; that he was twice married, his first marriage occurring in 1855; that there was born to this union in 1856 one child, a daughter (the contestant in this case); that shortly after the birth of this child, the testator gave her to her maternal grandmother, and saw her only occasionally until she was about eight or nine years of age, when she spent a few months at her father's home, attending school in the neighborhood; that when this child was about fourteen or fifteen years of age, and able to do manual labor, the testator requested her to return to his home and live with him, this being the first request of this kind that he ever made of his daughter; that the daughter refused to accede to his request, and shortly thereafter, when she visited at her father's home she was treated coldly during the day and when she started to leave for her grandmother's home, she was told by her father, the testator, not to come back there to his home any more; that a year or two after this event, the daughter became engaged to marry a young man in the neighborhood, who, while poor, came of respectable parentage, and whose habits were reasonably good; that this young man with his brother, went to see the testator to ask for the hand of the daughter in marriage; that as soon as they had stated the purpose of their coming, the testator flew into a violent passion, seemed to lose control of himself, talked excitedly and vehemently, managing, however, to say that he had rather that his daughter would marry a negro or a dog, and continued this violent language until the suitor for the hand of his daughter, with his brother, departed, leaving the testator still talking and gesticulating; that the testator said that he would rather that his daughter would marry a negro than her husband; that the daughter, however, married the said suitor, this event occurring in October, 1872; that from the day when the testator told his daughter not to come back to his home, he never spoke to her; and later, when children, nine or more in number, were born to her, he never spoke to any of them; that when he would meet his daughter, he would either turn his back, or drop his head, or if he had opportunity, would run or walk fast and hide either in some building or in some convenient vegetation; that although his daughter lived

within about four miles of his home, he never went to see her after her marriage, although he lived for about thirty-eight years after that event; that the testator never spoke to his daughter, her husband or any of the children after the time indicated and never counseled, advised or assisted her or her family in any manner whatsoever after the time indicated; that he never went to her home or on the little farm on which she resided; that on several occasions after her marriage, the testator remarked that she had married a low-down, or no-account fellow, against his will, and that he had never spoken to her or visited her, and never would as long as he lived—when in truth, the husband of the daughter was poor, lived a good life, and enjoyed a reasonably good reputation in the community in which he lived; that the testator after her marriage never spoke of his daughter or any member of her family, except in terms of disparagement; that when excited or worried, the testator would lose control of himself and when he would attempt to talk his auditor would not be able to understand what he was saying or trying to say; and he was very much excited at the time of said marriage of his daughter and thereafter for some time; that when he was in this excited condition, in the language of one witness he seemed to be "a little off"; that notwithstanding her father did not speak to her, the daughter always endeavored to speak to him and did so when she could get within hearing distance of him, and her husband did likewise, and the daughter taught her children to speak to their grandfather which they did, with the result above indicated. Assuming further that the mother of the daughter, when she died, owned some personal property and particularly a nice mare, which after the death of the wife, the testator took possession of, with the promise that the mare should be turned over to the daughter when she was ten years of age; that the testator took the mare, worked her and used her and kept her for more than fifteen years after the death of his wife; and several years after the daughter had become ten years of age; that the testator never accounted to the daughter for this mare or any of her progeny, and never turned over to the daughter the mare or any of her progeny; that while the testator was not a rich man, he was in comfortable circumstances, owning the farm upon which he lived, and was in reasonable circumstances up until the time he deeded the farm to his wife as hereinafter stated; that in 1873, the testator owned a valuable farm that at that time was

worth approximately $8,000, and at the time of his death approximately $12,000 to $15,000; that he also owned some personal property, live-stock, farming implements; that the mother of the said daughter died in 1858, and in 1860 testator married again; that in 1873 the testator made a will in which he does not mention his daughter's name, but by which he devises his property to his wife (that is, his second wife) for life, with remainder over in fee to a child of his second wife and to such other children as might be born as the result of the latter union, excluding from any participation in his estate the said daughter; that the only financial assistance that the testator ever gave to his said daughter was $2 in money, a cheap bonnet and some school books, although his daughter was poor and her husband was also poor, practically all the property they owned being a little farm worth from $1,000 to $2,000 with a mortgage on it for about one-fourth to one-third of those amounts and on which it is difficult for them to earn a livelihood, their said farm being worth from $500 to $1,000 when the alleged will was executed; that notwithstanding the provisions of this will, in 1894, for the stated consideration of one dollar, the testator deeded his said farm with the intervention of a trustee, to his wife absolutely; that later in life, along about the year 1908, he transferred a considerable portion, if not the greater part of his personal property that he owned at that time to his son by his second marriage, a man, at that time, more than thirty years of age, with the result that at the time of his death, he owned very little property, less than $1,000, or certainly not much in excess of that amount, although during the last 25 years of his life he had been a man in comfortable circumstances as above indicated; that he never at any time after his marriage showed any affection for his daughter; never assisted or looked after her welfare or the welfare of her husband or any of the children, many of whom were girls; that on one of two occasions, disinterested persons undertook to remonstrate with him regarding his attitude toward his daughter and her family, but without success, and he declined to become reconciled to his daughter or to speak of her or her family in any other than disparaging terms, this mental attitude of the testator toward his daughter continuing without interruption from 1872 to 1910, the year in which he died; assuming the existence of these foregoing facts, did the testator in your judgment, in 1873, and particu-

larly in the spring of that year, have sufficient mind and memory to know his natural obligations to his daughter in the matter of the disposition of his estate?"

To this question, Dr. Board answered:

"I would say that assuming the facts stated in the hypothetical question propounded are true, that the man was destitute of moral sense and did not have proper mind to make a just will." Doctor Board was asked on cross-examination; Q. "What fee do you charge for giving depositions under these conditions?" And his answer was: "$10.00. Let me further elucidate that answer. When the attorney approached me on this subject I told him I would look at his question, and if I felt that I could conscientiously answer it favorably to him I would so state, and would charge him simply for my time, as I had on a former occasion, when he approached me, declined to testify for his client because I could not conscientiously do so. I read the question, and told him what my answer would be to his question, and told him that I would charge a fee of $10 for my time." Dr. Board never saw the testator. This hypothetical question states appellee's case as strong as it could be stated under the evidence. For contestee, three doctors who had been well acquainted with the testator for years, testified; one of them, who graduated in 1873 and who knew him before that time; another who had known testator since 1866; and the third, who was his family physician, and who had known testator intimately the last twelve or thirteen years of his life, and who attended him in his last illness. These together with a large number of the neighbors of testator (some of whom had been raised with him, and a number of whom were well acquainted with him in 1873) all testified that he had sufficient testamentary capacity all his life and was above the average man intellectually.

So, the question is squarely presented: Does the conduct of testator in respect to his daughter, authorize the invalidation of his will?

It is said in Schouler on Wills, section 162, that "Insane delusion should be distinguished from prejudice, or error, as well as from eccentricity. It differs essentially from some rational belief, not well-founded, however perversely the testator may have clung to it. An ill-founded belief, not actually insane, does not destroy testamentary capacity. And where one indulges in an aversion, however harsh, which is the conclusion of a reasoning mind, on evidence no matter how slight or inaccurate, his will

cannot be on that account overturned. Middleditch v. Williams, 45 N. J. Eq., 726.''

It appears that in the case at bar, Thomas C. Purdy held an aversion for his daughter; but she had preferred a home with her grandmother, to his own; she had married a man to whom he had serious objections; and she had never in any manner sought to be reconciled with him. His aversion may have been unjust; it may have been ill-founded; it was perversely clung to by him, in the absence of efforts on the part of the daughter to induce him to relinquish it; but it was not an insane delusion as that term is used in law, no matter what it may be called in medical jurisprudence.

In Snell v. Walden, 243 Ill., 496, it was said:

''Unless the testator's conduct proved the existence of an insane delusion, it would be no reason for setting aside the will. Injustice, unfairness, prejudice or anger without a reasonable cause, does not disqualify a person from making a will.''

In the case of Conner v. Skaggs (Supreme Court of Mo.), 111 S. W., 1132, the testator had become incensed at his daughter because of her marriage with a man of whom the testator did not approve; and, in the making of his will, he disinherited her. She contested the will, and her proof was directed to the establishment of a form of monomania; that is, a derangement of testator's mind in regard to a single subject only, that of said daughter. In the opinion, the court said:

''Testator's opinion as to the soundness of Mr. Conner's (the son-in-law's) morals may have been grossly narrow and unjust; but there was no insanity about it. It is natural and usual for men to act on what they are told by others in whom they trust. * * * The resentment of the father was natural and human, although extravagantly exhibited. That he did not rise to the lofty and divine plane of complete forgiveness when time had healed his wounds, was unfortunate, but still human and natural, not insanity.''

In the Estate of Kendrick, 130 Cal., 460, it was said: ''In considering these specifications, it is important to bear in mind what an insane delusion is, and what kind of an insane delusion will justify the refusal of probate to so solemn and important an instrument as a will. Prejudices, dislikes and antipathies, however ill-founded, or however strongly entertained, cannot be classed as insane delusions; nor is every delusion an insane delusion. Whenever one's mind is tricked and deceived into

a false opinion or belief, it has been played upon; it is *deluded.* But an *insane* delusion is the *spontaneous* production of a diseased mind leading to a belief in the existance of something which either does not exist, or does not exist in the manner believed.''

Viewed in the light of these authorities, what was there in the conduct of Thomas C. Purdy to invalidate his will? The prejudice, resentment, or anger of testator toward his daughter may have been without reasonable cause; yet, it was not the *spontaneous* production of a diseased mind based upon no evidence whatever; for it had some basis in fact. It arose from the refusal of his daughter to live with him, and from her marriage with one to whom testator objected; and, however imperfect the process of his reasoning, or however illogical or unjust the conclusion that she was so greatly at fault as his conduct toward her proves his belief to have been, it was not without *some basis in fact;* at least there was sufficient to free it from the imputation of *spontaneity,* and, therefore, from the charge of having its origin in an insane delusion.

It may generally be said to be a trait of human character to procrastinate the execution of a will until one's thoughts have been insistently directed to the fact of the inevitable journey to our long home. Then, and only then, in many instances, is a will executed; and an instrument prepared, signed and witnessed under such circumstances, is not to be lightly set aside. The very purpose of the statute of wills was to recognize and create a right in the owner, having testamentary capacity, to make disposition of his property according to his own choice and pleasure, and in variance, if need be, to the usual rules of inheritance as fixed by the statute of descent and distribution. And, if by reason of such conduct as has been shown in this case, on the part of Thomas C. Purdy, his will shall be made the subject of attack and its determination, dependent upon the whims and caprices of a jury, then it may as well be said by one who wishes to devise his property, ''I desire that my property be distributed in the following manner; and I hope that a jury will think upon this subject as I do, and confirm my act.''

The lower court should have granted appellant's motion at the close of the evidence, and instructed the jury to find the instrument in contest to be the last will of Thomas C. Purdy. The judgment is reversed for proceedings in conformity to the views herein expressed. The whole court sitting.