## Coffey, et al. v. Miller, et al.

(Decided October 21, 1914.)

### Appeal from Wayne Circuit Court.

1. **Wills—Insane Delusion.**—The fact that a testator reached a different conclusion from some of his relatives and practically excluded them in his will from sharing in his estate for the reason, as alleged, that they were unkind to him and were against him when his barns were burned, does not make his belief such an insane delusion as to overcome the presumption of capacity to make his will.

2. **Wills—Undue Influence.**—The objection to the will that it was the result of undue influence exercised on the part of one of the principal beneficiaries is not sustained by the evidence. It is at most a bare supposition without any tangible evidence to support it.

W. R. CRESS & SON, JOE BERTRAM and O. H. WADDLE & SON for appellants.

HARRISON & HARRISON, DUNCAN & BELL, GEORGE E. STONE and J. BRYAN STONE for appellees.

OPINION OF THE COURT BY JUDGE TURNER—Affirming.

Armstead Miller, a bachelor over sixty years of age, died in Wayne County on the 21st of December, 1911, leaving an estate valued at forty thousand dollars or more, and leaving as his heirs at law two brothers and a number of nieces and nephews, the children of deceased brothers and sisters.

He left an original will dated the 18th day of June, 1905, which is as follows:

"I Armstead Miller of the county of Wayne and State of Kentucky being of sound mind and disposing memory do ordain and publish this as my last will and testament hereby revoking all others heretofore made by me.

"First: It is my will and desire that all my just debts be paid out of my estate. It is further my will and desire and I hereby give and bequeath to my cousin F. C. Miller Ten Thousand Dollars to have in cash or real estate either one that I may have in my possession at my Death. For her kindness shown me during my sickness.

"Second and it is further my will and desire and I hereby give and bequeath to my Beloved Brother John W. M. Miller the Remainder all and every interest that I may own or have in any real or personal property or estate at the time of my death.

"It is my further Will and I hereby appoint Brother John W. M. Miller my executor of this my last will and testament, and request the county court of Wayne county not to Request Bond of said Miller.

"Given under my hand and seal this 18th day of June, 1905.

                              "ARMSTEAD MILLER."

On the 20th of August, 1908, he executed what is called a codicil to this will, which is as follows:

"Codicil.

"It is my will and desire to Dispose of my property at my death in the following Way and Manner.

"I bequeath to my cousin, F. C. Miller, Ten Thousand for her kindness shown me during my sickness.

"I also Bequeath to my nieces and nephews all their lawful parts except four namely. Maud Shearer, P. M. Coffey, C. L. Cooper, which they shall pay four thousand Dollars each of them out of their parts which shall be equally Divided among the other heirs for their uncindness showen me in my sickness, and also being agains me in the Burning of my Barns and shooting in my House.

"I bequeath to my nephew F. F. Cooper Ten Dollars and this is to be in full of his part for his unkindness shown me in the Burning of my Barnes and shooting in my House and also for the way he conducted the goods business for me while a Pardner.

"this is my last Will and Testament given under my hand signed and sealed this 20th day August, 1908.

                              "A. MILLER."

On the 15th day of December, 1911, and just six days before his death, another codicil was executed by him, which is as follows:

"Sumpter, Ky., Dec. 15, 1911.

"Coticell of A. Miller.

Willed to F. C. Miller the amount of Ten Thousand Dollars.

Willed to Robert Hurst the amount of One Thousand Dollars.

This same to be paid him after he becomes of age—that is 21 yrs.

Willed to William Homer Hurst Five Hundred Dollars; this sum to be paid when he becomes of age—21 yrs. old.

Willed to P. E. Cooper, my nephew Five Dollars, no more or no less.

Willed to F. F. Cooper Five Dollars, no more or no less.

Willed to Clem Cooper his equal share after his debts are paid, that he owes me.

Willed to Miller Cooper his equal share after his debts are paid, that he owes me.

Willed to Janson Cooper his equal share after his debts are paid, that he owes me.

Willed to M. H. Miller his equal share after his debts are paid, that he owes me.

I will to Pearson Miller my nephew his equal part.

I will to Pearson Coffey, my nephew Five Hundred Dollars, less than his equal share for his unkindness shown me during my trouble, The Burning of the barn.

I will to Maud Coffey Shearer, my niece, Five Hundred Dollars less than her equal share for her unkindness to me during trouble, that is the burning·of the barn.

I will to Frank Miller my brother, his equal share, after all his debts are paid to me that he owes me.

I will my brother Marion an equal share.

I don't want my land that Marion and I own divided until his death.

A. MILLER."

Witness: G. W. Pyle,
Witness: G. M. Ferrell,
Witness: 'Miss' Marion Casey, Nurse."

These three papers were offered for probate in the Wayne County Court, and were admitted to record by that court, from which judgment an appeal was prosecuted to the Wayne Circuit Court, where a trial resulted in a peremptory instruction by the court directing the first two papers to be found as the last will and first codicil of the deceased, and submitting to the jury the question as to the competency of the deceased when he executed the last named paper; the jury found against the last named codicil, whereupon, judgment was entered directing that the first two papers be recorded as the last will and testament of the decedent, and from that judgment this appeal is prosecuted, there being no cross-appeal as to the validity of the last named codicil.

The decedent and his brother, J. W. M. Miller, who was named as executor, were near the same age and lived together all of their lives, and owned a great deal of property in common, and by their combined efforts had each accumulated a competency. Some fifteen or sixteen years before the death of A. Miller his brother was paralyzed, and while he was able to get around the house and yard and occasionally go to the county seat, he was never thereafter an active man, although he retained his mental faculties.

The two brothers owned the old home farm which had been left by their father, and there lived with them as housekeeper their cousin Miss Fayette C. Miller; in fact she had lived with their mother and father in their lifetime.

At the time the papers involved were executed by A. Miller the household consisted of the two bachelor brothers, the cousin Fayette C. Miller, a negro man named Ingram, and a white cook named Coffey.

The contest is grounded upon two ideas:

First. That the testator was at the time each of the papers were executed laboring under an insane delusion toward some of the natural objects of his bounty, which delusion resulted from fraud practiced upon him by Fayette C. Miller and others inducing him to believe that certain of his nieces and nephews were his enemies; and that because of chronic alcoholism and his diseased condition resulting therefrom he did not have sufficient mind to understand the nature and value of his estate or his obligations to his relatives, or to dispose of his property according to a fixed purpose of his own.

Second. Because each of the papers were procured to be executed through the fraud and undue influence of Fayette C. Miller and others acting in concert with her.

The evidence shows that from about 1902 until his death A. Miller was afflicted with chronic alcoholism, although during all that period, except the last few months of his life, he was an active business man, managed his own affairs and those of his paralytic brother, ran the farm, bought and sold stock, carried on a mercantile business, acted as director in a bank, and attended to all these things in an efficient and businesslike way. As to his general mental capacity in 1905 and 1908 there is no conflict in the evidence, one physician testifying that he had known him for forty years, that he had never seen him except within a few weeks of his death when he was not capable of transacting any kind of business.

But the charge that he was laboring under an insane delusion, that some of his nieces and nephews were his enemies, grows out of some most unusual and unexplained occurrences at and around his home during the late winter and early spring of 1904. It appears that during that period there was something approaching a reign of terror; two of his barns were burned, a grain house was set afire, shots were frequently fired around his house at night, the house was actually fired into upon one or more occasions, rocks were thrown against the house and around and about him. Guards were employed to guard the place, the neighbors and relatives came and stayed at night to assist, and the sheriff and his deputies stayed on the premises several nights to aid in ascertaining the cause of these disturbances.

Out of this condition two theories as to their cause were evolved. First. The sheriff and his deputies, a number of the neighbors and some of the relatives reached the conclusion that the negro man Ingram and the Coffey woman, possibly aided and assisted by others, were responsible therefor; and second, the two old men and Miss Miller believed that certain men in the neighborhood with whom the Millers had had a protracted and bitter litigation were at the bottom of the trouble.

Warrants were issued for Ingram and the Coffey woman, and upon their examining trial they were held to the grand jury, when they were indicted; but the attorney for the Commonwealth filed the indictments away. Warrants were also issued for the three men suspected by the Millers, and two of them were arrested,

the other leaving the State; but it does not appear whether any of them were ever tried or convicted.

The decedent, A. Miller, believed firmly in the innocence of his two servants, went on their bond, and otherwise actively assisted in their defense. He was very much incensed and outraged at their arrest, and fell out with a number of his neighbors and relatives because of their belief in their guilt. The negro man Ingram had lived with the Millers since his boyhood, and the Coffey woman had lived with them several years.

The charge that he was laboring under an insane delusion that certain of his nieces and nephews were his enemies grows out of this situation.

It will be observed that he did not charge any of his relatives with being guilty of any of these outrages themselves, but, as expressed in the first codicil, merely with "being against me in the burning of my barns, and shooting in my house;" that is he felt that they had unjustly sided against him and his trusted servants about a matter which vitally involved his welfare and happiness; and it might very well have been that he felt the stand they had taken as to the guilt of his two trusted servants, of whose innocence he was fully convinced, might have prevented him from punishing the real guilty parties.

An insane delusion is an idea or belief which springs spontaneously from a diseased or perverted mind without reason or without foundation in fact; it is distinguishable from a belief which is founded upon prejudice or aversion no matter how unreasonable or unfounded the prejudice or aversion may be. If it is the product of a reasoning mind no matter how slight the evidence upon which it is based it can not be classed as an insane delusion. In every day life men of the strongest minds, being in possession of the same facts, reach different conclusions. In this case Miller being presumably in possession of at least as much knowledge about these occurrences as his relatives and neighbors, reached a different conclusion as to who were the guilty parties, and the fact that he reached a different conclusion from most of his relatives and neighbors does not make his belief an insane delusion.

This question was exhaustively treated in the recent case of Purdy's Admr. v. Evans, 156 Ky., 342. In that case the court quoting from Schouler on Wills, said:

"Insane delusion should be distinguished from prejudice, or error, as well as from eccentricity. It differs essentially from some rational belief, not well founded, however perversely the testator may have clung to it. An ill founded belief, not actually insane, does not destroy testamentary capacity. And where one indulges in an aversion, however harsh, which is the conclusion of a reasoning mind, on evidence, no matter how slight or inaccurate, his will can not be on that account overturned."

And again, after reviewing the authorities, the court said:

"Viewed in the light of these authorities, what was there in the conduct of Thomas C. Purdy to invalidate his will? The prejudice, resentment, or anger of testator toward his daughter may have been without reasonable cause; yet it was not the spontaneous production of a diseased mind based upon no evidence whatever; for it had some basis in fact. It arose from the refusal of his daughter to live with him, and from her marriage with one to whom testator objected; and, however imperfect the process of his reasoning, or however illogical or unjust the conclusion that she was so greatly at fault as his conduct toward her proves his belief to have been, it was not without some basis in fact; at least there was sufficient to free it from the imputation of spontaneity, and, therefore, from the charge of having its origin in an insane delusion."

Tested by the rule therein laid down it can not be said that the decedent in this case had an insane delusion that certain of his nieces and nephews had mistreated him. It can not be said to have been unnatural for this old man to have thought and felt that in this trying period of his life when his property was being destroyed, and his very life threatened, as he believed, that he was entitled to the fullest support and comfort from his relatives.

The only remaining question to be determined is whether there was any evidence of undue influence. The uncontradicted evidence is that Fayette C. Miller never saw the original will or the first codicil until after they were prepared by Miller in his own handwriting. There is an absolute failure of evidence to show that she exerted or attempted to exert any influence in the preparation of either of those papers. Nothing was more natural than this old bachelor should have amply

provided for his first cousin and housekeeper who had for long years presided over his home, and who doubtless in many ways had aided him and his brother in the accumulation of their property.

It may be said that the theory of appellant that Miss Miller instigated the trouble at the Miller home and aided and assisted Ingram and the Coffey woman in the perpetration of those outrages for the purpose of frightening the decedent into the making of a will, is not founded upon the. least evidence. It is, at most, a bare suspicion without any tangible evidence to base it upon.

We are of opinion that the lower court properly instructed the jury, and the judgment is affirmed.