## Trustees of Epworth Memorial Methodist Church, et al. v. Overman, et al.

(Decided November 21, 1919.)

### Appeal from Fayette Circuit Court.

1.  Wills—Insane Delusion.—A clause in a will disinheriting deceased's children "on account of the utter and extreme disregard and disrespect shown me by all of my children as their father for many years in sickness, affliction and health" is not sufficient to warrant setting aside the probation of the will because of an "insane delusion" where it is clearly established that the father had facts as a basis of his conclusions and not spontaneous imaginations, it being shown that for many years he was completely isolated from his children, who made practically no attempt to visit him or correspond with him.

2.  Wills—Insane Delusion Defined.—An insane delusion such as will render one incapable of making a will is such a mental state as is supported by no evidence whatever, and is purely the product of imagination; prejudice, aversion, or ill-founded belief, on evidence, however slight, is not sufficient.

GEORGE W. VAUGHN and SMITH & REYNOLDS for appellants.

A. M. BAKER and J. T. FARMER for appellees.

OPINION OF THE COURT BY JUDGE CLARKE—Reversing.

Appellees are the children of Henry Hughes, deceased, who in this action are contesting his will upon

the sole ground that it was executed under an insane delusion as to their feelings for and attitude toward him. His testamentary capacity otherwise is fully established and not denied by anyone.

In his will is the following clause practically disinheriting all of his six children and assigning his reasons for so doing:

"Furthermore, on account of the utter and extreme disregard and disrespect shown me by all of my children as their father for many, many years in sickness, affliction and health, down to the present time, I can only give and bequeath to each of them that may be living the sum of one dollar ($1.00) in cash without any ill will or animosity toward them whatever. . . .

"For reasons above given, I cannot and do not give any of my living children any of my real estate whatever."

His estate consisted of a small amount of personalty and four small houses, one of which and most of the personalty is devised to his wife absolutely, and the other real estate to her for life with remainder to the church of which he was a devout member for years.

To prove the asserted insane delusion the only son and the three unmarried daughters testified that their attitude toward their father as well as that of the two other daughters had always been respectful and affectionate and that he had always seemed to be fond of them; that their father was not a successful business man and that the children as soon as they were old enough had gone to work and helped in the support of the family until the death of their mother in 1897 and until his second marriage in 1899; that their father was violently opposed to the marriage of his daughter, Mrs. Overman, upon the ground that her husband, who was from Indiana, was a "Yankee;" that the two younger daughters remained with the father and his second wife for about a year after their marriage, in their home in Lexington, Ky., when, with the father's consent, one went to live with the brother and sister in Louisville and the other to live with a married sister in Demorest, Georgia, where she remained for a time attending school and then joined the unmarried brother and sisters in Louisville. None of the children gave anything to their father after his second marriage, and since then all of

the property he owned at death was accumulated by him without their assistance, except $500.00 inherited by him from his mother. It is also shown from the evidence that shortly after their father's second marriage his only other son died, leaving his small estate to his brother and sisters to the exclusion of the father, and that this hurt and angered him to such an extent he employed a lawyer and threatened suit, but that this matter was settled out of court by payment to him of some amount not disclosed. Just before this son's death, and while he was in a hospital at Lexington, with one of his sisters who was a trained nurse attending him, the father made two trips to the hospital to see this son, but was not permitted to see him, although the other son was "in and out," the daughter merely sending him word by a stranger that the son was too ill to see him. In the nineteen years betwen his second marriage and his death, his only surviving son, who is a conductor on the C. & O. Railway and passes through Lexington regularly on his run between Louisville and Ashland, Kentucky, has never visited his father in his home or met his second wife, or seen him except when his father happened to be on his train or at the depot in Lexington; neither of the two married daughters ever visited him and none of these three children ever wrote to him. The oldest of the three unmarried daughters, Miss Bessie, the trained nurse who sent him word but did not even go tell him his son was too ill to see him, never visited her father in his home, but went there once or twice when he was out at work, and saw him occasionally on the street and once accidentally on a train. The next unmarried daughter, Miss Arrie, wrote her father one letter which he did not answer, and visited him once or twice after his second marriage, but stayed at the home of a friend, eating only one meal at her father's. The youngest daughter, Miss Elsie, kept up a regular correspondence with her father until his death and visited him at his home once or twice a year, but elected to live with her brother and sisters in Louisville. The last two named attended his funeral; the four other children were sick and unable to be present.

There is not an intimation that the second marriage was opposed by any of the children or that the second wife was not the fine Christian woman she appears in the evidence to be, or that she ever said or did anything

to offend any of the children or to indicate that she did not want them to visit or communicate with their father.

The son offers no explanation for his failure to visit or write to his father in all of these years; the three single daughters explain their conduct in this respect as well as that of their married sisters who do not testify, upon the ground of living away from Lexington, being busy making a living, and the lack of means or time to go to see him. There is no evidence that the father ever visited or was asked to visit any of the contestants.

These are the material and pertinent facts developed by the testimony of the contestants, and had they been stated in the hypothetical question propounded to medical experts and alienists instead of the ten pages of typewritten matter dealing almost exclusively with the period preceding decedent's second marriage, when everything in this typical and mutually helpful family of the better middle class was serene despite a rather severe struggle for comfortable existence, we doubt if any of these experts, even those who found evidence of an insane delusion in the mere language of the will, would have testified as they did. But even if mistaken in this, and we may be, we are sure this evidence if not justifying the father's action in disinheriting his children, a question upon which neither the jury nor the courts have a right to pass, at least did not convict him of mental incapacity resulting from an insane delusion.

Just what happened between the death of the first wife, mother of the contestants, and the marriage to the second, and about the death of the son, Abner, that resulted in the almost complete isolation of this father from his children for the remaining eighteen or nineteen years of his life, is not disclosed by the evidence, but that it happened and resulted in the father's isolation are facts clearly established, despite the shallow outward appearances of cordiality upon the occasional chance meetings.

An insane delusion that renders one incapable of making a will is difficult of accurate definition, but it is much more than bias or prejudice, or any merely incorrect mental attitude. It is rather a wholly irrational state of mind on a particular subject, that is, such a mental state as is supported by no evidence whatever, and therefore purely a product of the imagination. As

said in Purdy v. Evans, 156 Ky. 342, 160 S. W. 1071, quoting from Schouler on Wills, p. 162, "Insane delusion should be distinguished from prejudice, or error, as well as from eccentricity. It differs essentially from some rational belief, not well founded, however perversely the testator may have clung to it. An ill-founded belief, not actually insane, does not destroy testamentary capacity. And where one indulges in an aversion, however harsh, which is the conclusion of a reasoning mind, on evidence no matter how slight or inaccurate, his will cannot be on that account overturned." To the same effect are Coffey v. Miller, 160 Ky. 415, 169 S. W. 852; Shorb v. Brubaker, 94 Ind. 165; Drum v. Capps, 240 Ill. 524; Owen v. Crumbaugh, 228 Ill. 318, 119 A. S. R. 442; Potter v. Jones, 20 Or. 239, 12 L. R. A. 161.

However differently others might have appraised the facts disclosed by contestants' evidence, their father had facts, not spontaneous imaginations, as a basis for his conclusions of "utter and extreme disregard and disrespect for many years in sickness, affliction and health." The record therefore furnishes no proof whatever of an insane delusion, and it was error to submit the case to the jury, since they had no right to determine the only question raised by the evidence, viz.: whether the facts justified testator's conclusions therefrom.

Other alleged errors will not be considered since in this view of the case the judgment to be entered upon a return of the case will be directed by this court and another trial will not be necessary.

Broaddus, &c. v. Broaddus' Heirs, 10 Bush 309; Bush, &c. v. Lisle, 89 Ky. 402; Childres, Ex.'s v. Cartwright, &c., 136 Ky. 498; Hildreth's Ex'ors v. Hlidreth, 150 Ky. 601; Cecil's Exors. v. Anheier, 176 Ky. 198.

Wherefore the judgment of the circuit court is reversed and cause remanded with directions to dismiss the appeal from the judgment of the county court probating the will.