### Wigginton's Executor, et al. v. Wigginton, et al.

(Decided January 13, 1922.)

## Appeal from Nelson Circuit Court.

1. Wills—Testamentary Capacity—Evidence.—Testimony to the effect that decedent received sums of money through his wife shortly after they were married was not competent as reflecting on his testamentary capacity or the subject of the natural objects of his bounty, as it imposed no obligation on him as to the disposition of his property other than that dictated by his duty as he sanely viewed it at the time of making his will. Its admission was prejudicial because it tended to create in the minds of the jury an erroneous belief as to the duty of testator in disposing of his property, whereas his rights and obligations in that respect were not affected by the fact that he had received some property through his wife.

2. Wills—Insane Delusions—Evidence.—Unnatural and depraved acts, committed by the decedent thirteen years before his death, were not competent as tending to prove an unsound mind or an insane delusion, in view of the fact that they were controllable in the presence of others and were limited to a period of a few days

and the tendency was not shown to have manifested itself theretofore or thereafter in the testator's life.

3. Wills—Insane Delusions—Testamentary Capacity.—An insane delusion affecting the power of testamentary capacity is a spontaneous production of a diseased mind leading to a belief in the existence of something which either does not exist or does not exist in the manner believed. The acts and circumstances relied on as evidencing insane delusions in testator, considered and held lacking in those elements necessary to impress them with the quality of insane delusions, within the meaning of the term as defined.

4. Wills—Undue Influence—Submission to Jury.—Opportunity to unduly influence the decedent is not of itself sufficient evidence to submit the case to the jury on the question of undue influence. Evidence examined and held not to warrant the submission of that question to the jury.

5. Wills—Non-Expert Witnesses—Scintilla Rule.—The opinions of non-expert witnesses that testator was of unsound mind are not sufficient to produce the necessary scintilla for the jury, unless such opinions are based on acts and circumstances which of themselves induce conviction, and the court will look beyond the opinions to the acts and circumstances in determining whether the necesary quantum of evidence is adduced.

6. Wills—Undue Influence—Mental Capacity.—Inequality of disposition of property alone to natural objects is not enough evidence to take the case to the jury, nor is it sufficient that the inequality be gross and unreasonable but it must be combined with other corroborating evidence of unsoundness of mind or of undue influence to make out a prima facie case.

7. Wills—Mental Capacity—Non-Expert Witnesses.—The opinions of non-expert witnesses to the effect that decedent was of unsound mind and the acts and circumstances on which such opinions are based, in conjunction with a proven strain of insanity in testator's family and the unequal disposition of his property, considered and held, in view of all the facts and circumstances shown in the evidence for contestants, insufficient to induce conviction or to constitute the necessary scintilla on the question of testamentary capacity.

KELLEY & KELLEY and SAMUEL K. BAIRD for appellants.

NAT W. HALSTEAD, THAD CHEATHAM and OSSO W. STANLEY for appellees.

OPINION OF THE COURT BY JUDGE MOORMAN—Reversing.

J. M. Wigginton died on April 17, 1919, a citizen and resident of Nelson county, Kentucky, after having executed on April 3 and on April 8, 1919, two papers pur-

porting to be his last will and as such probated in the Nelson county court. These papers are contested in this suit.

The decedent was seventy-seven years of age at the time of his death. He left surviving him as his next of kin two daughters, Annie B. Wigginton and Mrs. Emma Cornell, and one son, Jesse Wigginton, who was then and is now confined in the insane asylum. Emma Cornell was married to a prosperous farmer who lived at Fairfield, where testator resided, and her elder sister, Annie B. Wigginton, was then living with the Cornells. Emma Cornell had several children and the son, Jesse Wigginton, had three infant children who resided with and were maintained by their mother, a school teacher of Taylorsville, Ky.

Under the main paper in contest the decedent devised to each of his children the sum of $1.00, and to the three infant children of his son Jesse he gave $6,000.00 in liberty bonds, making $2,000.00 for each of them. He devised to J. C. Cain, a neighbor, the sum of $500.00 in recognition of services rendered him during his various illnesses, at different times in the last eleven years of his life. The remainder of his estate he gave to his daughter-in-law, Annie Wigginton, the wife of Jesse. By the other paper purporting to be a codicil he devised to Mrs. Edna Turner, a neighbor who had been kind to him, a horse, buggy and a cow. The entire estate amounted to approximately $9,000.00.

J. C. Cain was made the executor of the estate without bond and the papers having been probated in the county court, the two daughters appealed from the order probating them and on the trial in the circuit court they were found not to be the last will of J. M. Wigginton. This appeal seeks to reverse that judgment.

The deceased married Mary Elizabeth Crume in 1863, and shortly thereafter he bought a farm near Fairfield in Nelson county, where he and his wife resided until her death, which occurred in 1904. The three children born to them were brought up on the farm and resided there until the younger daughter and son were married, when they left, but the elder daughter remained until 1906, nearly two years after the death of her mother, and she then went to the home of her sister, where she has since resided. After the elder daughter left he continued to live on the farm until 1913, when he purchased a small

house in Fairfield and moved into it, where he resided at the time of his death.

The evidence shows without contradiction that J. M. Wigginton was a kind and indulgent father so long as his wife lived, and that he gave to his children better educational advantages than were customarily afforded children in like financial circumstances. It also shows conclusively that he was a man of inflexible will and violent temper. He was intensely hostile to those who incurred his anger and this quality was exhibited in the treatment accorded his daughters after the breach which occurred between them and him in 1906. His conduct towards his daughter, Annie, which contestants say caused the breach, his unyielding hostility to the daughters thereafter, and his indiscreet and perhaps unjustifiable utterances in regard to his son, together with the existence of a strain of insanity in his family, constitute the main foundation for the existence of mental incapacity and delusional insanity, as alleged in avoidance of the papers purporting to be his will.

Aside from the evidence on the points stated, there is nothing in the record of substantial import that in any wise reflects on the capacity of the decedent to make a will disposing of his property, according to a fixed purpose of his own, having in mind the extent of his property and the obligations that rested on him. It remains to be seen, from an examination of that evidence, whether the established facts and circumstances relating to his conduct as indicated, and the reasonable inferences to be drawn therefrom are such as warranted the rejection of the papers offered in evidence on the ground of undue influence or lack of that capacity requisite to a legal disposition of property by will.

The evidence offered by contestants with the view of establishing mental unsoundness, delusional insanity and undue influence, is too extensive in its scope for detailed discussion in this opinion. The main points relied on may be stated briefly as representative of the different features of the contesting evidence, and here it should be observed that the testimony of Annie Wigginton, wife of the contestant, Jesse Wigginton, was properly excluded. (Section 606, Civil Code; Henning v. Stevenson, 26 Ky. L. R. 159.)

The two daughters testified that shortly before the death of their mother in 1904, the decedent indulged in unwarranted criticism of his son, that this was unlike his

previous attitude and that after the death of the mother he grew more critical and severe. They said that he cursed his son and said he was "no account," that he had killed ten horses belonging to decedent and was ruining him, all of which was untrue. A brother-in-law of the deceased said that four or five years before his death, he came to Taylorsville and indignantly accused the witness of encouraging the son to go into the huckster business and lose money, that there was no foundation for the accusation and thereafter the father had nothing to do with the witness. However, this witness admitted that he had assisted the son in borrowing money for use in the huckster business and to that extent had encouraged the enterprise. On the other hand there was evidence to show that the son had been unsuccessful, inefficient and unambitious, that the father had helped him financially and had lost money by reason thereof, and while the father complained bitterly it was always because, as he said, the son was worthless. It appeared that the decedent did not see his son for several years before the son was sent to the asylum, was not notified of the inquest into the son's sanity and did not learn that he had been adjudged insane until after his confinement in the asylum, but that he then seemed distressed.

Perhaps the most effective testimony offered by contestants was that given by Annie B. Wigginton, the elder daughter, in relating two or three incidents that occurred in 1906 when she and her father were living alone on the farm. She testified that he made certain suggestions to her accompanied with indecent behavior, which rendered it impossible for her to continue to live in the house with him. It is unnecessary, as well as undesirable, to incorporate into this opinion the shocking details of these incidents as revealed by this witness. Accepting her statements as true, which we do, it must be concluded that J. M. Wigginton, then sixty-four years of age, was at that time either totally depraved or absolutely insane. And yet, it is difficult to approach either of these conclusions after a full consideration of the evidence.

Relative to the first inference it must be observed that there was nothing in decedent's life, before the alleged incidents, to indicate that he was a man lacking in moral instincts or deficient in correct conceptions of his obligations to society and to his family. Nor was there manifested thereafter in his life any evidence of moral delinquency in the respect indicated by the evidence in ques-

tion. He possessed a violent temper and an unbending will, but no moral delinquency in the sense indicated by this evidence was ever shown to have touched his life. He had been a kind and indulgent father, recognizing his obligations to his children, and throughout the years of his married life, beginning with young manhood, he had been a faithful husband. It would, therefore, seem that the conduct must be attributed to an unsound mind or an insane delusion.

But that, too, is difficult to understand, if not wholly refuted by the uncontradicted facts in the case, for, while the succeeding thirteen years of his life are scrutinized carefully in this record, the revolting tendency is not shown to have again manifested itself. It is not conceivable that mental unsoundness of this kind or delusional insanity would manifest itself so potently in a limited period of three weeks and never thereafter be observable in the succeeding thirteen years of the decedent's life. It would be a charitable extenuation to attribute his conduct to an insane delusion, but insane delusions are spontaneous and are not controlled by circumstances or the presence of others or limited in their manifestations to a narrow period of time and never again discoverable. The theory of delusional insanity is not strengthened by the record of the two contestants in their treatment of their father after the breach for which his conduct is said to be responsible. Their bitterness towards him thereafter was no less intense than his bitterness towards them. They never spoke to him again until he was dying, and contrasting their condition of life with his it would seem that their anger was greater, for his age and method of living invited and ought to have aroused their sympathy and pity. Had they believed him insane then, they would have been grieved and humiliated but one cannot understand how they could have been angry. Had they in the years that followed been less severe in their judgment and more generous in their feelings, it would be assumed that they then regarded him as irresponsible and such assumption would afford a rational basis for their belief as expressed on the trial, that at the time he was insane.

The evidence for contestants also shows that about the time of the incidents referred to, the decedent would beat his horses, curse his children, clench his fists and grit his teeth. The two daughters testified that the day Annie B. Wigginton left he accused her of robbing him,

cursed them and told them never to return. Other witnesses testified that after the separation from his family when his daughters' names were mentioned he became violently excited and angry and cursed them and his son-in-law. Several of these witnesses said they believed that he was of unsound mind, but their testimony was based almost invariably on his conversations in regard to his children and his hostility towards them.

There was evidence tending to show that decedent neglected his farm in the latter years of his life, that he repudiated a contract for the planting of tobacco and that he permitted some cattle to die on his place during the very cold winter about two years before his death. One witness who saw him at a trial said that he did not seem to be the same man that he had formerly been, but this was several years before he died. Another said, when calling on him, he became frenzied with rage, gritted his teeth and walked the floor cursing his children, but this, too, was several years before his death. Others said he accused his daughters of robbing him and they believed his mind unsound in regard to his children. Many of them, however, admitted that he was a good trader and that he appeared normal and sane except when aroused on the subject of his children. There was also some evidence showing that he sold to Cain a part of his farm at a price below its actual value, but there was other testimony to the effect that the price paid represented its full value.

The evidence for the contestees tended to show that the reason for his anger towards his children was that he regarded his daughter Annie as having abandoned him in his old age and attributed that abandonment to the influence of her sister and his son-in-law, that the charge which he made as to his daughters having robbed him was based on their having taken some articles from the house when Annie B. Wigginton left and particularly the taking of his wife's picture which he especially prized, that his son Jesse was consistently unsuccessful in business and had lost money for decedent. Those who saw him most frequently, his physician who wrote the will, his neighbors and those who had frequent transactions with him, all stated that he was of sound mind and retained full possession of his mental faculties until his death. When the two daughters finally came to see him a few days before his death his conversation and manner and his treatment of them indicated a perfectly sound

mind. He received them quite as cordially as they greeted him. He was not effusive but he showed no bitterness, but neither were they effusive nor did they exhibit any tenderness.

On the evidence as substantially detailed, the trial court submitted the case to the jury on the questions of unsoundness of mind, undue influence and insane delusions, the latter being on the hypotheses that the deceased had lost or expended large sums of money on account of his son; that the son had killed his horses; that his daughters or one of them had robbed him of his property; that his daughter Emma had stolen his daughter Annie away from him; and finally as to his right to sexual relations with his daughter Annie.

This court is asked to reverse the judgment of the court below on the following grounds: first, because of the admission of incompetent testimony that is alleged to have been highly prejudicial to contestees; second, because the contestees were entitled to a directed verdict at the conclusion of all the evidence; third, error of the lower court in giving an instruction on undue influence; and, fourth, like error in instructing the jury on the theory of insane delusions.

The law allows a wide latitude in the admission of testimony which relates to the issues necessarily raised in contesting the validity of a will. However, it is a well recognized rule that the testimony in cases of that kind, as well as other cases, must be pertinent to the issue involved and is not admissible where its effect is not probative, but is merely influential as affecting a collateral subject that the jury is not called on to consider and that does not properly reflect on the issues in controversy. It is under this rule that an attack is made on the testimony of J. W. Crume, who was permitted to say that Mrs. Wigginton received from her father and grandfather a sum of money approximating $5,000.00, which was reduced to the possession of decedent and used by him. This testimony was objected to and should have been excluded from the consideration of the jury. It threw no light on the subject of decedent's soundness of mind or the question of an insane delusion or that of undue influence. Neither was it illuminative of the inquiry into his ability regarding the included subject of knowledge of the natural objects of his bounty. Whatever he received through his wife became his property, under the law as it then existed, was used jointly with his wife

through a long period of married life in the maintenance of their home and the bringing up of their children, and could not reasonably be said to impose on him the duty of finally disposing of it in equal parts among his children, or making any disposition of it other than that dictated to him by his duty and obligations as they were sanely viewed at the time of making his will.

There is a decided tendency among jurors to consider the subject of testamentary capacity in the light of what they may deem a just disposition of the property, and while that is a proper element to be considered in certain cases, in connection with other relevant facts and circumstances, it cannot be injected into the case by the proving of facts that impose no obligation on the testator in disposing of his property. The natural effect of this testimony was to bring to the minds of the jury the erroneous belief that it was the testator's duty to dispose of his property, to the extent indicated, equally among his children, which duty in fact did not exist any more than it existed as to his other property. The testimony was, therefore, prejudicial.

Complaint is also made of the testimony of Annie B. Wigginton in detailing to the jury the revolting conduct of her father, immediately preceding her departure from his home. This testimony was doubtless offered with the view of establishing delusional insanity as well as unsoundness of mind. We do not regard it as relevant on either issue. The conduct occurred thirteen years before his death and nothing in his life, after its occurrence, indicated the existence of an insane delusion of that kind. The evidence does not warrant the belief that it was the result of an insane delusion, but assuming that it was and that it caused the breach and the consequent hostility between him and his daughters, there was never a recurrence of the delusion and the record is devoid of any fact or circumstance tending to show that it projected itself into or became a part of the papers executed as a will.

An insane delusion affecting the power of testamentary capacity, as uniformly construed, is the spontaneous production of a diseased mind leading to a belief in the existence of something which either does not exist or does not exist in the manner believed. Prejudice, resentment, anger and moral delinquency may all exist without reason therefor, but if the delusional phase is not the spontaneous production of a diseased mind, based on no evidence

whatever, it will not be classed as an insane delusion. In Schouler on Wills, section 192, it is said:

"Insane delusions should be distinguished from prejudice or error as well as from eccentricity. It differs essentially from some rational belief, not well founded, however perversely the testator may have clung to it. An ill-founded belief, not actually insane, does not destroy testamentary capacity. And where one indulges in an aversion, however harsh, which is the conclusion of a reasoning mind, on evidence no matter how slight or inaccurate, his will can not be on that account overturned."

In Purdy's Admr. v. Evans, 156 Ky. 342, this subject was exhaustively treated and it was there pointed out that an essential factor in the existence of an insane delusion is spontaneity; that a delusion in the sense that one has been tricked or deceived into a false opinion or belief is not sufficient to affect the validity of a will, but it must be the spontaneous production of a diseased mind to be brought within the scope of an insane delusion. (Coffey v. Miller, 160 Ky. 415; Trustees of Epworth Memorial Methodist Church v. Overman, 185 Ky. 773.)

Having in mind the essential element of spontaneity over which the mind has no control, the conduct of decedent as detailed by his daughter when considered in connection with the record of his life is not impressed with the quality of an insane delusion, as defined by the courts. His immoral and depraved tendency and desire, as revealed by the testimony of the daughter, was controllable in the presence of others and was never manifested except on the three occasions referred to in her testimony. It was not a spontaneous production of a diseased mind over which the decedent had no control, for had it been it could not have been restricted to privacy, controlled in the presence of others and limited in its manifestations to a period of a few days. It is a well recognized principle that evidence of an insane delusion or of unsoundness of mind must approximate the date of the will, or there must be some evidence showing a continuation of the diseased mentality until the time of the making of the will. There being no evidences of a recurrence of this unnatural tendency during the thirteen years that elapsed before the making of the will, the incidents related by Annie B. Wigginton must be regarded as too remote for competency. If the testimony was admissible at all, it was admissible solely for the purpose of explaining the breach between

the father and the two daughters. Further than that its pertinency was valueless.

The authorities cited are applicable to the asserted right of contestees to a directed verdict. From a consideration of the evidence we must conclude that there was a failure on the part of contestants to make out a case for the jury on the question of insane delusions. The evidence does not sustain any of the hypotheses embraced in the instruction given on that subject. There were some facts, as a basis for all the alleged insane delusions of decedent, except that with reference to his daughter Annie B. Wigginton, which as we have seen had no competent testimony supporting it, and however differently the jury might have appraised the value of those facts they furnished a basis for the belief of decedent, however unreasonable it might have been. Consequently it must be concluded that his mental attitude towards those alleged facts, incorrect as it might have been, having some basis, was not evidence of an insane delusion and the question was not one for the jury or available for invalidating the papers offered in evidence as the will.

Nor was there sufficient evidence to submit the case to the jury on the question of undue influence. It is not claimed that the chief beneficiaries of the will exercised any influence over decedent, but it is claimed that J. C. Cain, who received a bequest of $500.00, unduly influenced him. There is, however, a dearth of evidence in support of this claim. Cain saw a great deal of him during his various illnesses and, indeed, his treatment of the old man was commendable, but nevertheless had he used his associations to unduly influence the decedent in the disposition of his property the papers offered in evidence could not be upheld. But it is not shown that decedent's characteristic determination was impaired towards the end of his life or that he was influenced by Cain. He thought well of Cain and appreciated his kindness as was but natural, but the opportunity which Cain had to unduly influence him, if he had been susceptible of such influence, is not shown to have been utilized and is not of itself sufficient evidence to authorize the submission of the question to a jury. It is said in Cecil's Exor. v. Anheir, 176 Ky. 198:

"It is the established doctrine in this state, that in order to show undue influence sufficient to invalidate a will, it is not enough that there was an opportunity to exercise undue influence, or that there was a possibility

that it was exercised, but some evidence must be adduced and show that such influence was actually exercised. . . . And by evidence is meant something of substance and relevant consequence and not vague, uncertain or irrelevant matter not carrying the quality of proof or having fitness to induce conviction. (Brent v. Fleming, 165 Ky. 365; Clark v. Young's Executor, 146 Ky. 377; Jones v. Beckley, 173 Ky. 840.) ''

Under the ruling announced in the cases cited we conclude that the evidence in the present case did not warrant a submission of the question of undue influence to the jury.

Coming to the other question of whether there was sufficient evidence of unsoundness of mind to require the verdict of a jury, it should be stated that the later decisions of this court in cases of this kind have construed the scintilla rule as meaning that evidence is something of substance and relevance and not vague or uncertain or irrelevant matter, not impressed with the quality of proof or having fitness to induce conviction. And so it is held that opinions of non-expert witnesses that the testator was of unsound mind at the time of the execution of the will are not sufficient in the absence of other evidence to create the necessary scintilla, unless those opinions are based on facts and circumstances shown in the evidence which of themselves reasonably induce the belief expressed by the witnesses.

In this case there were non-expert witnesses who expressed the opinion that the deceased was of unsound mind, but their testimony was based on his indiscreet denunciations of his children and his bitter anger towards them. The preponderance of the evidence showed that there was no justifiable cause for this bitterness but there was some evidence showing that he had just cause for so feeling. But his incorrect mental attitude in that respect, if it was incorrect, did not furnish the requisite quantum of evidence for a scintilla. His hostility towards his children was no stronger evidence of an unsound mentality on his part, when considered in the light of his temperment and disposition, than was their hostility towards him during the same years an evidence of unsound mentality on their part.

In Cecil's Exor. v. Anheir, *supra*, several laymen expressed the opinion that Cecil was of unsound mind, but their testimony was not deemed sufficient in the absence

of the showing of facts reasonably inducing such an opinion, to submit the case to the jury.

The same rule was applied in Robinson v. Davenport, 179 Ky. 598, and again in Schrodt, Exor. v. Schrodt, 181 Ky. 174, where it was said:

"It will be observed that the only evidence of mental incapacity consisted of the opinions of non-expert witnesses based on the fact that the testatrix permitted her mind to wander from the subject under discussion and that she did not maintain what the witnesses considered a good fire or provide herself with nourishing food. We have frequently written that, where the facts relied on are insufficient to show mental incapacity the opinions of non-expert witnesses based thereon are likewise insufficient for that purpose. Clarke v. Young, 146 Ky. 377; Bush v. Lisle, 89 Ky. 393; Hildreth v. Hildreth, 153 Ky. 601.)"

In Langford's Exor. v. Miles, 189 Ky. 515, it was held that the burden of showing mental incapacity or undue influence is on the contestant, and that it must be met by testimony of sufficient substance to have probative effect on the issues involved. The testimony as to the mental impairment of the testator in that case was decidedly stronger than in the case at bar and there were non-expert opinions to the effect that he was of unsound mind, but it was held that the necessary scintilla was not adduced in evidence, and the will was sustained.

In Wood v. Corcoran, Admr., 190 Ky. 621, it was again held that the quantum of testimony necessary to raise a scintilla of evidence must be such as to induce conviction, and that the court would examine the facts on which the opinions of non-expert witnesses were based and in the absence of such facts as would reasonably induce the opinions expressed would not regard such expressions as having probative value or as constituting a scintilla.

The decision in the Wood case, *supra,* and the authorities cited in support of the conclusion there reached, while recognizing the force of the scintilla rule hold in this class of cases that, in determining what constitutes a scintilla—a question that must be determined in every case where it is raised—the quantity and character of evidence adduced must be such as to induce conviction in order to produce the necessary scintilla, and that isolated acts or circumstances not reasonably inducive of the opinion expressed, are not sufficient.

We have also held that inequality of disposition of property alone to natural objects is not sufficient evidence. (Kevil v. Kevil, 65 Ky. 614; Munday v. Taylor, 70 Ky. 491; Lisle v. Couchman, 146 Ky. 345.) The inequality must be gross and unreasonable and then only when combined with corroborating evidence of want of capacity or undue influence is the *prima facie* case made out entitling the jury to consider and determine the question of testamentary capacity.

But a case of gross and unreasonable inequality is not presented here. It is true that Annie B. Wigginton is deprived under the will of any part of the estate, but for years she has lived in the home of her sister in comfort far beyond that which she could have had at her father's home and she has become one of her sister's family according to her own testimony. Emma Cornell and her children are in reasonably affluent circumstances. The chief beneficiaries under the will are in less fortunate financial condition and it was not unnatural or unreasonable in view of the relations existing between the father and his daughters for him to give his property to the infant children of his unfortunate son and thus enable them so far as possible to prepare themselves for useful citizenship.

Looking beyond the non-expert opinions in this case to the competent facts on which they are based, there are to be found isolated acts of indiscretion, and perhaps injustice, which are not uncommon in a rational person of the age, temperament and disposition of decedent; and while these acts and circumstances would corroborate substantial evidence, they alone, or in conjunction with the proven strain of insanity in testator's family and the unequal disposition of his property, are not, in view of all the facts and circumstances shown in the evidence for contestants, sufficient to induce conviction or to constitute a scintilla within the meaning of that term as construed in the authorities cited. We must, therefore, hold that there was not sufficient evidence to take the case to the jury on the question of unsoundness of mind.

On another trial if the evidence be substantially the same as that given on the last one, the trial court will instruct the jury to return a verdict sustaining the will and codicil.

For the reasons stated the judgment is reversed for proceedings not inconsistent with this opinion.