## Rueff v. Light et al.

(Decided March 4, 1938.)

450

RICHARD B. CRAWFORD, KENDRICK LEWIS, RICHARD P. DIETZMAN and THOS. A. BALLANTINE for appellant.

DODD & DODD for appellees.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Affirming.

On February 1, 1935, appellant instituted suit in the lower court seeking anulment of her father's will. She named as defendants the appellee, individually and

as executrix, Oscar Light, her brother, and five or more institutions, to which testator had made bequests.

Appellee asserted in her pleading that her father, Frank P. Light, died in January, 1934, leaving surviving the three children mentioned above; that the will had been admitted to probate and, as provided therein, appellee had qualified as executrix, and was so acting.

The will is challenged on the grounds that at the time it was executed and prior thereto the testator was so incapacitated mentally as to be unable to properly execute a will. It was also charged that the will was prepared and executed under undue influence on the part of appellee.

Issue was raised by the filing of an answer by appellee, denying the allegations of the petition. After hearing proof offered by appellant, the trial court sustained appellee's motion for a verdict directed in her favor, followed by dismissal of the petition, and from the court's ruling appeal is prosecuted. The contentions urged as grounds for reversal are: (1) Error of the court in directing the jury to return a verdict for appellee, defendant below, and (2) error of the court in not permitting a witness to give answer to a certain propounded hypothetical question.

The will, executed March 3, 1932, after providing for payment of debts, by item 2 devised to his son Oscar three lots, two with improvements, located in or near Louisville, and a gold watch. To this item there was added:

> "In explanation of this devise and bequest I desire to say that I am bearing in mind that my said son was extravagant with that portion of the estate left to him by his mother, and up till this time there has been no change in his actions, and he has not lived at home for approximately five years."

By item 3 of the will the testator gave appellant a lot and two buildings located at 529 Roselane street and a lot in Edgewood subdivision. He added,

> "In making this devise I have taken into consideration the fact that during her unmarried life my said daughter Elma had sufficient opportunities to provide for herself and earned a large salary until

she was married, and after my beloved wife died my said daugher continued to work until she was married, and after she married she left my home, as was to be expected, and has a husband who is amply able to provide for her.''

To the daughter Catherine (appellee) testator devised the residue of his estate, consisting of seven or more parcels of real estate, all of which were particularly described in the writing, his personal property on the ''premises of the homstead,'' life insurance, stocks, cash on hand. Testator explained that the devises and bequests to appellee were so made ''because she is the youngest of my children; because she has been very faithful to my interests and my comfort; because she gave up valuable employment when she had opportunity for promotion to care for my home, and she has faithfully looked after my interests and comfort and has acted as housekeeper for me since the death of my beloved wife.''

Testator died on January 11, 1934, when he was about seventy-six years of age. The mother, who had executed a will in 1921, died in 1927. Appellant was married September 11, 1931. Prior to 1921, testator had been an employee of the Standard Oil Company, retiring in that year on a pension, his retirement being due to a nervous breakdown. Some trouble seems to have arisen after the retirement of testator. When the mother died, both the daughters were living in the home. Each had substantial positions; the appellant was making about $140 a month and appellee about $120. Under the mother's will, the three children received jointly for life the real estate owned at the time of her death. This property apparently consisted of parcels of real estate with improvements of a moderate rental value. In August, 1928, testator, the two daughters, and the son entered into a written contract whereby it was agreed that appellee was to give up her employment and ''devote her entire time to the management of the home,'' jointly maintained by the four members of the family. The contract provided that before there was made a distribution of the income from rental properties, Catherine should be paid monthly the sum of $100. She at once gave up her work and entered into the performance of the contract, and carried it out until her father's death. It worked satisfactorily until the time of, or shortly be-

fore, appellant's marriage in 1931. It is claimed that there then arose an unfriendliness, if not decided hostility between the two sisters, from which it is said it was made apparent that appellant was not wanted in the home. She says that though she had been a kind and dutiful daughter there was objection to her being married in the home. She was compelled because of this objection to go to a hotel to dress for her wedding and was later married in church. After her marriage, the breach between appellant and the father and appellee became widened. It is claimed that Catherine did much to prevent appellant from visiting her father. Appellant says that Catherine and the father quarreled frequently; that her father had assured her that he would devise his estate equally to the two daughters. Appellant testifies that she did not attempt to visit her father from the time of the marriage until July, 1933, giving the reasons for her failure. In September, 1933, she says she learned from neighbors that her father was ill. Thereafter she relates, by reference to a diary which she had kept, each and every day she visited or attempted to visit her father. Of some fourteen visits to the home she was admitted about ten times and denied admittance about four times, or on some of the occasions failed to get response when she sought admittance. Once she was told that her father could not see any one; again not admitted by a new nurse in attendance. All these failures to see the father she charges to the hostile feeling toward her by her sister. It appears that in July, 1933, testator deeded all his property to Catherine. Appellant says she raised no complaint because of the condition of her father. The appellant and her sister had not spoken to each other since some time in 1931. It is claimed that the mother and father had made wills in 1921 by which they had willed their respective properties to the three children. This is not so clear as to the father. In 1932 appellant was requested to meet the father at some bank for the purpose of opening a lock box so that the father could remove the former will, which was done. The will in contest was written very shortly after this time. When this will was removed, as appellant testifies, there was found in the box the following memorandum in type:

"To be attached to agreement: Remarks. On July 1, 1930, Elma A. Rueff failed to comply with the

attached agreement. Catherine, who gave up a good position after her mother's death on November 8, 1927, to supervise the running of the home, continued to handle it. There was no substantial reason for such action on the part of Elma. It wasn't the right thing to do, therefore that part of the agreement was handled by me. September 3, 1931. Frank P. Light.''

It is the contention of appellant that the writing mentioned was conceived, planned, and written by her sister. It appears from the proof that though the testator could neither read nor write English he could sign his name, and appellant agrees that the memorandum bore her father's signature.

Shortly after the date of the memorandum, appellant received a letter signed by the father in which he mentioned the fact that the burden placed on appellee was unfair, since she derived ''no more out of it than the other two.'' He mentioned the hardships she was undergoing in carrying out her part of the contract. In this letter he also mentioned some other family matters, perhaps in a way holding appellant to task for some things which had gone amiss. In reply to this letter appellant wrote quite a lengthy letter covering seven or more pages of typewritten matter, as it appears in the record. It would serve no purpose to incorporate the letter into this opinion, nor would it serve to enlighten any one if we undertook to repeat extracts from it. Its contents are known to counsel and parties who are directly interested. It may be noted that appellant says she saw her father in ''the first part of 1932 when 'I gave him the will out of the box.' '' It is somewhat significant that the will in contest was executed March 3, 1932. It may be said that the letter, in a measure, undertook to explain about the masses and the money left or to be used for the purpose. Had the letter stopped with explanation, it would have read much better. It is claimed by appellant that the letter to which hers was a reply was conceived and written by Catherine, but this conclusion or surmise is not fortified by proof that such was the case. It seems to be admitted that the father had also signed it.

It is claimed by appellant that after the birth of her child in 1933 the father caused his property to be conveyed to Catherine. Why this was done after mak-

ing his will is not shown. It was shown that in January, 1931, testator made Catherine beneficiary in a life policy for $1,000 and in October another policy for $2,000. The three children had formerly appeared as beneficiaries. One change was made before appellant was married, the other soon thereafter.

Soon after her marriage appellant went to the home, and finding no one there used her latch key, entered the house and obtained some of her clothing and left a note demanding a settlement of rents and naming a date when she would return. When she did return, she found the door lock had been changed. It is admitted by appellant that she failed to keep the contract, entered into by the family with appellee as agent and housekeeper, but she says that "Catherine broke it first by accepting outside employment"; to what extent or what the employment was is not shown.

We have given enough of the testimony in detail to present a picture of the unfortunate domestic situation in this home. It is perhaps fragmentarily reproduced, so because of the numerous details given by appellant in testimony covering almost one hundred pages.

Coming now to proof as to the mental condition of testator "at the time he executed the will and a long time prior thereto," one witness, a neighbor, said that after his illness in 1921 she "didn't think he was right because when I would go there at the start he was friendly * * * but after he got sick he never paid any attention to us, and would not talk to us toward the last * * * before his last illness." Another said that prior to his sickness in 1921, "he was a very alert man, friendly, and after that illness his mind did not seem clear. He would tell you the same thing over five or six times and ask the same questions over in the course of an evening." Another "did not feel that his mind was as clear as it used to be * * * he used to repeat so many things and switched from one subject to another. He was not alert as he formerly was." "When I saw him last he was using a cane, and he was on a bus and rode to Brook street and from there he waited to get another bus to ride to Floyd street, which was just one square." One witness, who had not noticed any change in testator's health after his illness, said, "I saw him doing something out there that I did not think it was right for a man of his standing to do." It developed that what

the witness did not think was right was the hauling of some plaster board and old tires from the ruins of a service station which had been destroyed by fire.

It is fair to say that some of the witnesses quoted above also undertook to testify as to the coolness on the part of daughters and of the family (save appellant), during a part of the time they lived together, and after the appellant was married, but such testimony lacks probative quality on the charge of influence. The testimony of these witnesses as to mental capacity appears to be wholly wanting in probative value. If having any at all, it is far from that quality of testimony which would tend to lead to the conclusion that in 1932, or any other time, except perhaps during the last days of his illness, testator was not competent to execute a valid will. Three physicians testified: Dr. Stites attended testator in August, 1933. He secured a past history of testator, which included the 1921 illness and the previous stroke of apoplexy. He recited what he recalled at the time of such history. Asked what effect on a man's mind and body a stroke of apoplexy would have, the witness said:

"That is somewhat variable. With some individuals the deterioration of their mental and physical faculties is rather rapid. With others it is a slow process."

Asked whether persons "suffering from a stroke of apoplexy would be more or less responsive to influence," he answered:

"I think it depends to some extent on the extent of the stroke, and the location of the hemorrhage. I found Mr. Light was very pleasant in his demeanor. He would answer my questions intelligently. He was somewhat childish in his age, probably a little more than a man of his age might be. Otherwise his demeanor was what you would expect of a man of his age."

Dr. Stites was then propounded a hypothetical question which the court, over objection by appellees, would not permit him to answer, to which ruling appellant objected. We shall refer to this later.

Dr. Gardner saw Mr. Light in December, 1933, and testified:

"He was at that time very much disturbed about not sleeping well. He was impatient about the matter, rather depressed, inclined to be a little weepy, and altogether discouraged about his condition. He was more or less helpless. He was sitting up in a chair, but I understood that it was necessary to help him around from place to place and to put him in bed. He was unable to walk and take care of himself."

This doctor also heard a history of testator's previous illness. He followed substantially Dr. Stites' opinion as to the effect of an apoplectic stroke, concluding:

"High blood pressure itself may begin to produce degenerative changes even before the stroke comes on, but the stroke itself would not of necessity indicate anything very definite about his mental capacity."

This witness was also propounded the same hypothetical question as had been asked Dr. Stites with the same ruling as had theretofore been made. By avowal on each occasion, it was stated that if witness was permitted to answer, each would say that at the time of making the will Mr. Light was mentally incapacitated to such an extent that he could not make a valid will.

Dr. Simpson recalled the fact that he had treated testator in 1921 at the time of his nervous breakdown.

"He had considerable anemia and was melancholy. He had lost weight and strength and had some kidney involvement. Bright's disease and obstinate constipation. He had been in bed some weeks. I saw him a few times until November of that year."

The doctor said his last service was to write a letter to the court stating that "in my judgment Mr. Light is not in any physical or mental condition to serve as a juror." Witness did not know what happened to testator after that time. Asked what effect "that type of disease would have on a man as it progresses," witness answered:

"It might be possible for the man to get well, the condition I saw him in."

This witness was not propounded the hypothetical question.

We have not quoted the expert and lay testimony at

length (though we have given it in substance) because we note in appellant's brief the following:

"In so far as mental capacity is concerned, if the court correctly excluded the testimony of the doctors in response to the hypothetical question, then we agree we are not entitled to go to the jury on this issue."

We quite agree with counsel's expressed conclusion as to the weight of adduced testimony.

It is noted in the record that Dr. Stites and Dr. Gardner, the two physicians who had briefly attended testator in 1933, and whose testimony is substantially above recited, were the two doctors to whom the hypothetical question was propounded. Dr. Simpson had attended Mr. Light in 1921. When the court sustained the objection to the propounded questions, he said that he "did not base his ruling" on the absence from the question of such testimony as Dr. Simpson might give." We shall treat of it as if Dr. Simpson had theretofore given his testimony, assuming that the difference in order of introduction would have not caused any change therein. The court in his ruling based same on the idea that there was not a proper foundation laid, and there would be "no probative value in whatever his answer would be." Without discussing the probative value of an answer from the witness, which the avowal shows would have been favorable to contestant's theory, we quite agree that the foundation was not properly laid, since the lay testimony was of no probative value, and the question embodied matter not brought out in any testimony—including that of Dr. Simpson—and failed to include some facts which, under all rules of evidence in respect to such questions, should have been fairly included.

Without encumbering the record with the entire question, it is noted that each witness was asked to base his opinion on the assumption "that fourteen years before his death he had a nervous breakdown, accompanied by high blood pressure, hypertension, and an acute attack of cardia vascular disease * * * and assuming that his condition gradually became worse, and in 1932 he had paralysis and high blood pressure. * * *" The objection, when the proof is closely read, is easily discernible. The reference to paralysis and high blood

pressure in 1932 is not confined to a period prior to or about March 3d of that year. There is no mention by any doctor or layman anywhere in the record of the diseases or symptoms of some diseases included in the question. Dr. Simpson said when he treated Mr. Light from September to December, 1921, he was suffering from those disabilities which we have mentioned above. The same witness said positively that when he treated Mr. Light his blood pressure was 140, which he said was "about normal."

The principal objectionable feature was in the failure of the question to develop the proven facts, or rather in misstating facts shown by the proof. The record shows that Mr. Light was ill in 1921; it does not show that he "gradually became worse" or became worse at all. Appellant herself says that for four or five years there was improvement in his condition. He accepted more or less responsible, periodical employment, sometimes at the race track, sometimes at the State Fair, and at all times up to a period before his death seemingly attending to his own affairs, though perhaps not in such manner as to meet the full approval of appellant. There is an absence of testimony showing visitation by any physician between November, 1921, and December, 1933. We note also that a lawyer of standing testified that Mr. Light came to his office and had him write his will in March of 1932. He described him as a man of intelligence and activity. Mr. Light dictated (out of the presence of his daughter Catherine) the substance of his will. A stenographer read the notes, it was transcribed, and read to him and he signed it.

Going back now to the hypothetical question and the court's ruling that it was inadmissible:

"It is fundamental that hypothetical questions propounded to the experts must reflect the true state of facts in evidence." New York Life Insurance Company v. Long, 211 Ky. 656, 277 S. W. 978, 979.

A reading of that case will demonstrate that the defect in question here propounded is similar to that in the cited case; an omission of intervening facts. In Kentucky Traction & Terminal Co. v. Humphrey, 168 Ky. 611, 182 S. W. 854, 858, we condemned a question asked of an expert because the "proof wholly failed to justify

the incorporation of these statements in the question complained of.'' We said of the rule:

> "The hypothetical question grouping therein the facts forming the premises upon which the answer of the witnesses must be based must include no facts not shown by some of the testimony to have existed; nor must it omit any relative fact shown by some of the testimony to have existed."

Reference may also be had to Wigginton v. Wigginton's Ex'r, 205 Ky. 613, 266 S. W. 245; McGraw v. Ayers, 248 Ky. 166, 58 S. W. (2d) 378; Cincinnati, N. O. & T. P. R. Co. v. Ross, 212 Ky. 619, 279 S. W. 1075; Stacy v. Williams, 253 Ky. 353, 69 S. W. (2d) 697; Cincinnati, N. O. & T. P. R. Co. v. Duvall, 263 Ky. 387, 92 S. W. (2d) 363. Applying the rule announced in the foregoing citations, and measuring the propriety of the question by the rule, we are clearly of the opinion that the court ruled correctly in not permitting it to be answered.

In dealing with the question of undue influence, we need not do more than refer to what has been detailed above, adding that there is a total lack of evidence which would indicate that the testator was even susceptible of being influenced. That there was ample opportunity for the daughter in the home to have persuaded him contrary to his will is not to be denied, but a showing of opportunity is not sufficient. · It must be shown that undue advantage was taken of the opportunity.

It must be admitted that there existed· a coolness and, perhaps, some hostility between the sisters, and between appellant and the father. The coolness between father and daughter may be said to have begun when the appellant failed to bear her part of the burden enforced by the contract, and further developed when she married. The breach widened thereafter; who was at fault we cannot say. The ultimate was reached when the father received the letter of December 1, 1931. Taking into consideration the sequence of related events and circumstances leading up to March, 1932, we are persuaded that the testator had mind sufficient to appreciate the natural objects of his bounty, his duty to them, to make a survey of his estate and to dispose of it according to a fixed determination and purpose.

The will is evidential of at least some of these attributes. Some of the cases which may be cited as tending to uphold our views are: Clark v. Young's Ex'x, 146 Ky. 377, 142 S. W. 1032; Talbott v. Giltner, 179 Ky. 571, 200 S. W. 913; Schrodt's Ex'r v. Schrodt, 181 Ky. 174, 203 S. W. 1051; Middleton v. Skaggs, 263 Ky. 81, 91 S. W. (2d) 1016; Bodine v. Bodine, 241 Ky. 706, 44 S. W. (2d) 840, 841; Smith v. Smith, 243 Ky. 240, 47 S. W. (2d) 1036; Clark v. Johnson, 268 Ky. 591, 105 S. W. (2d) 576; Bennett v. Bennett's Ex'r, 244 Ky. 394, 51 S. W. (2d) 241; the last four cases together with cases cited therein being fittingly applicable on the question of undue influence.

In conclusion, we must, after a careful review of the reasons before us, agree fully with the court below in granting the peremptory instruction.

Judgment affirmed.