John Irvine GERARD, Executor, et al., Appellants,

v.

Elizabeth Irvine GERARD, Appellee.

Court of Appeals of Kentucky.

Feb. 10, 1961.

As Modified on Denial of Rehearing Dec. 1, 1961.

Coleman, Harlin & Orendorf, Bowling Green, for appellants.

Milliken & Milliken, Bowling Green, for appellee.

CLAY, Commissioner.

In this will contest suit brought by a daughter of the testator, the jury found the latter lacked sufficient mental capacity to make a will. The executor and the other beneficiaries appeal. We need consider only appellants' contention they were entitled to a directed verdict because of insufficiency of the contestant's proof.

The testator, John M. Gerard, died in 1958 at the age af 82, leaving an estate valued somewhere between $100,000 and $200,000. On October 2, 1951 he had executed a will drafted by his lawyer. He

bequeathed to appellee, his only living daughter, $5,000. The remainder of his estate was left in three equal parts to his two sons and the children of a deceased daughter. In view of the size of the estate it is apparent appellee will not share equally with her brothers. This discriminatory treatment is the basis of appellee's claim that her father was insane for 50 years.

At the outset it may be observed that the law extends to the citizen a valuable privilege of disposing of his property at death as he sees fit, and the courts jealously guard this right. Langford's Ex'r et al. v. Miles et al., 189 Ky. 515, 225 S.W. 246. By nature a will expresses the discriminating wishes of the testator. Inequality in the distribution of an estate by will is not in itself evidence of mental incapacity. Wigginton's Ex'r v. Wigginton, 194 Ky. 385, 239 S.W. 455; Parks v. Moore's Ex'r, 265 Ky. 678, 97 S.W.2d 579.

The testator was blessed with good health all of his life. He died a natural death. No one questions his ability and capacity to transact business affairs. There is abundant evidence he had mental capacity to execute a will. The question before us is whether or not appellee presented sufficient evidence of the lack of such mental capacity to authorize submission of that issue to the jury. We will assume, without deciding, that all of the evidence introduced on her behalf was competent.

Our story begins in 1902 when the testator was 26 years of age and appellee was three years of age. That year he was apparently adjudged insane and committed to the Western Kentucky State Asylum in Hopkinsville. The records indicate his mental disorder as "paresis," although they fail to show he had any disease, bodily disorder or defect. He stayed for five months and was discharged as "improved." On February 3, 1903, by judgment of the Warren County Court, he was adjudged restored to his senses and of sound mind. While there is some indication he may subsequently have

entered other sanitariums, there is no evidence of any further commitments or investigations into his sanity.

In 1902 the testator was in the undertaking business with his father and his uncle Gene in Bowling Green (where the testator lived all of his life). For many years after 1903 the testator continued in the undertaking business, although the partnership with his father and uncle was dissolved. Though there is some reflection on his capabilities in the conduct of this particular activity, he was apparently quite successful in other business enterprises, particularly the buying and renting of real estate.

After 1931, with the help of an inheritance from his father the testator was able to accumulate the very substantial estate he owned at the time of his death. There is not a line of evidence in this record reflecting on the ability of the testator up until the day of his death (seven years after executing his will) to transact his business affairs in a perfectly competent manner. He had one attribute which cannot be considered abnormal. He did not like to spend money, or particularly, to give it away. (He did on occasion advance his two sons various sums.)

Two tragic events involving each of his two daughters took place during the testator's lifetime. In 1931, after his own father had died, the appellee (who had left home in 1915 and whose history will be briefly summarized later) brought legal proceedings to probate a will of her grandfather which had been destroyed. This was in effect a lawsuit against her own father, which carried with it at least an intimation of his wrongdoing. It was an unfortunate family fight. Her principal and most favorable witness, the brother Paul, branded this act of hers "a terrible mistake." This lawsuit, not unnaturally, severely strained the relationship between father and daughter. From that time forth he disowned her. He made statements to the effect that she was no longer his daughter and accord-

ing to her testimony he refused to recognize she even existed.

The other tragic event was the suicide of his other daughter in 1938. For approximately 10 years thereafter the testator secluded himself at his home during the daytime. After 1948 he resumed his normal way of living and thereafter visited regularly various public places in Bowling Green and renewed his former friendships. This ten years of relative seclusion throws little light on the issue of mental capacity to make a will, particularly since this period ended three years before he executed it.

We will now turn to the testimony of appellee. She starts with her very early childhood and tells a story of mistreatment. She said her father was sick, that one time he bit her nose when she was in bed with him, and at least once kicked her. (This happened over 55 years ago.)

In 1917, because of domestic difficulties (they are not too clear although she does allude to "mistreatment" and "violence") appellee left home for good at the age of 18. During the next 34 years (up until the date of the will) appellee returned to her home on very few occasions. As we read the evidence, she never returned for a normal visit to her family. She was brought home one time by her mother because of illness and on other occasions she would stop briefly at the hotel at Bowling Green. She testified that her father would refuse to let her in the house, or would fail to recognize her, or would threaten to leave town when she arrived on the scene. (We think it significant that while appellee attempts to prove her father insane because of his coldness toward her, no explanation is given of the fact that neither her mother nor her two brothers showed her any more sympathetic consideration.)

Except for the incidents of her childhood, which are so remote as to have little bearing on our problem, the substance of appellee's testimony is that her father refused to recognize her as his daughter, did not want her in his home, and refused to give her financial assistance. It is apparent from this record that on most occasions when appellee returned to Bowling Green, or communicated with her father directly or through one of her friends, she sought to obtain money from him. This was a most sensitive subject with the testator.

Other witnesses support appellee's testimony that she may have been mistreated in her youth, that her father did not assist her financially, and that he refused to recognize his daughter in the manner some might think a parent properly should. It must be borne in mind, however, that the testator's actions, feelings or motives are not on trial, except to the extent they show he lacked mental capacity to make a will on October 2, 1951. It is true that throughout his lifetime the normal father-daughter relationship did not exist, that he developed an aversion for her, and even animosity. However, his actions show a rational consistency flowing from circumstances which could support his convictions. Neither we nor the jury may sit in judgment on the justness of his position.

There are other bits of evidence indicating peculiarities and eccentricities of the testator. At one time he developed a habit of taking newspapers and not paying for them. Another time he looked through a neighbor's window, and another time he walked into somebody's house without knocking. These isolated acts, and others, fall short of establishing lack of mental capacity to make a will. Bickel v. Louisville Trust Co., 303 Ky. 356, 197 S.W. 2d 444. The same is true of the opinion expressed by the brother Paul, who had practically no contact with the testator for the last 20 years of his life and whose conclusion concerning absence of mental capacity lacks sufficient factual support.

Finally we reach the testimony of two expert witnesses. They were psychiatrists who had never examined or even known the testator. They were each asked a long hypothetical question as to the testator's mental capacity based upon his

1902 commitment and selected subsequent events in his lifetime. Only one of these witnesses would say the testator lacked mental capacity to make a will. This opinion has no probative value whatsoever for the reason that the hypothetical question included a distortion of the facts proven, a conclusion concerning the issue in controversy, and more particularly, it omitted certain very significant matters. For example, the witness was not advised that the testator had been restored shortly after his commitment in 1902; that the father and daughter had been involved as adversaries in a bitter lawsuit; that the testator was not prone to give money to anyone (including his daughter); and that the testator did remember his daughter in his will. The expert opinion was based upon a wholly inadequate representation of the significant circumstances and had no value as proof. Rucff v. Light, 272 Ky. 449, 114 S.W.2d 506.

The hypothetical question asked the other expert witness, while omitting several significant facts, did include a reference to the testator's will. This witness refused to testify the testator lacked mental capacity. The substance of his opinion was that possibly the testator could have been suffering from an "insane delusion." Even assuming that the hypothetical question asked this witness adequately presented all material facts (which it did not), the opinion of the witness was so equivocal and speculative as to have no probative value.

The issue of the "insane delusion" was submitted to the jury by instructions and has been discussed at length in the briefs. The contention of the appellee is that her father was laboring under the insane delusion that he had never had a daughter by the name of Elizabeth. This argument is destroyed by her own testimony. She relates several incidents in which her father clearly recognized her as his daughter. It is clear from this record that the testator, in alluding to the non-existence of his daughter, was using a figure of speech and meant simply that he was not going to accord to her the rights and privileges that a parent normally accords his child. Even if this was not true however, there is one item of documentary evidence in this case which completely wrecks the entire "insane delusion" theory. That is the will itself. Therein the testator did recognize his daughter as a proper object of his bounty, specifically named her, and bequeathed to her the substantial sum of $5,000. If he previously had an "insane delusion" on this subject, the will itself dispelled it.

■ We believe the true nature of this lawsuit has now emerged. The key is found in appellee's brief wherein it is stated that the jury verdict invalidating the will corrected "the most flagrant violation of the principles of justice." This same idea of injustice appears in the testimony of several of appellee's witnesses, whose opinions were that because of his prejudice against his daughter the testator would not be capable of making a will that would be "fair and equitable." The only case made for appellee was that it may have been unjust and unfair for him to be prejudiced against his daughter and to discriminate against her in the disposition of his property. That is not the issue involved in this lawsuit. Wigginton's Ex'r v. Wigginton, 194 Ky. 385, 239 S.W. 455.

After adding together all the peculiarities, eccentricities and prejudices of the testator and giving full effect to all of appellee's evidence concerning events in his life from 1902 until the date of his death in 1958, we are unable to find in this record any substantial evidence that on October 2, 1951 the testator lacked mental capacity to make a will. The statutorily given right to dispose of one's property at death would be unstable indeed if the testator's deliberate act could be invalidated upon proof of a preference between his children or a disposition of his property which some might think unjust. The case of Purdy's Adm'r v. Evans, 156 Ky. 342, 160 S.W. 1071, 1075, has many aspects similar to the one before

us. Therein the testator left his daughter nothing in his will. In deciding a directed verdict should have been given against her as contestant, the court observed:

> "The very purpose of the statute of wills was to recognize and create a right in the owner, having testamentary capacity, to make disposition of his property according to his own choice and pleasure, and in variance, if need be, to the usual rules of inheritance as fixed by the statute of descent and distribution. And, if by reason of such conduct, as has been shown in this case, on the part of Thomas C. Purdy, his will shall be made the subject of attack, and its determination dependent upon the whims and caprices of a jury, then it may as well be said by one who wishes to devise his property, 'I desire that my property be distributed in the following manner, and I hope that a jury will think upon this subject as I do, and confirm my act.'"

A will may not be subjected to such appraisal by a jury. See Kentucky Trust Co. v. Gore, 302 Ky. 1, 192 S.W.2d 749.

■ Appellee's evidence was insufficient to make a jury issue on the question of mental incompetence and a verdict should have been directed for the will. This not having been done, appellants' motion for judgment notwithstanding the verdict should have been sustained.

The judgment is reversed with directions to enter judgment upholding the will of John M. Gerard.